**IN THE UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

CENTENNIAL BANK,
an Arkansas state chartered bank,

     Plaintiff,

vs.                                    CASE NO. 8:16-cv-00088-CEH-JSS

SERVISFIRST BANK INC., an
Alabama state chartered bank,
and GREGORY W. BRYANT,
an individual,

     Defendants.

_____/

**CENTENNIAL'S VERIFIED MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND INJUNCTIVE**
**RELIEF WITH INCORPORATED MEMORANDUM OF LAW**

Pursuant to Federal Rule of Civil Procedure 65, Local Rule 4.05 and 4.06, and other applicable law, Plaintiff, Centennial Bank (the "Centennial"), hereby moves on the following grounds for the order of this Court temporarily and permanently enjoining ServisFirst Bank Inc. ("ServisFirst") and Gregory W. Bryant ("Bryant"), both of whom are referred to jointly and severally herein as the "Defendants," directly and through their agents and employees, including without limitation Pat Murrin ("Murrin"), and Gwynn Davey ("Davey"), together with Jonathan Zunz ("Zunz"), from engaging in a continuing course of conduct (as more fully defined below, the "Actionable Misconduct") pending adjudication of the claims asserted by Centennial in the complaint initiating this cause (the "Complaint"):

**A.**   **Factual Background Regarding Centennial, Bay Cities, and the Acquisition**

1.      Centennial is a financial institution operating in four (4) states from headquarters in Conway, Arkansas. Home BancShares, Inc. (the "Centennial Parent") owns Centennial as a holding company. The assets of Centennial currently approximate $9,000,000,000, making it a regional financial institution.

2.      Centennial employs approximately 1,507 Employees, including 56 in Tampa Bay. Centennial maintains a highly skilled management team operating throughout its territorial "footprint," that includes 145 branch locations.

3.      Centennial has committed significant resources to establish a strong business presence in Tampa Bay. Centennial's business presence in Florida has been based in Hillsborough, Pinellas, Manatee and

Sarasota counties (the "Tampa Bay Area"), where all of the Former Senior Officers have resided and/or worked for all times relevant hereto.

4.       Centennial's commitment to the Tampa Bay Area began during November 2012 with the acquisition of Heritage BancShares in Lutz, Florida.  Thereafter, during 2014, Centennial acquired Florida Transitions Bank in Dade City, Florida.  However, Centennial recognized that a strong presence in the Tampa Bay Area would best be served by a headquarters in Tampa, Florida.  Accordingly, during the middle of 2015, Centennial approached Bryant, who at the time was the President, Director, and CEO of Bay Cities Bank ("Bay Cities").

5.       After its founding in the 1990s, Bryant joined Bay Cities and its holding company, Florida Business BancGroup, Inc. (the "Bay Cities Parent"), as lender and was later promoted to President under an employment agreement dated January 1, 2003.  Bryant interfaced directly with Centennial in the negotiation, documentation, and closing of the entire process of Centennial's acquisition of Bay Cities, referred to throughout this motion (this "Injunction Motion") as the "Acquisition."

6.       On June 17, 2015 (the "Announcement Date"), Centennial and Bay Cities announced the anticipated Acquisition.

7.       On or as of October 1, 2015 (the "Acquisition Date"), Centennial, the Centennial Parent, Bay Cities, and the Bay Cities Parent closed the Acquisition under a "Merger Agreement" (the "Merger Agreement"), a copy of which is attached hereto as Exhibit "A."  Pursuant to the terms of the Merger Agreement, Centennial acquired all or virtually all assets of Bay Cities.  At the time of its acquisition, Bay Cities had approximately $541,000,000 in assets.  Centennial paid approximately $101,600,000 in connection with the acquisition of Bay Cities.  As a ratio of purchase price to assets of the acquired institution, the purchase price was a record amount.  Bryant's total incentive package in connection with this transaction exceeded $2,831,269.25, including bonus, non-compete, pension, and related payments.  As with the other Former Senior Officers, some of this incentive was paid on the date prior to the Acquisition Date, with the balance to be paid on December 23, 2015.

8.      In connection with Centennial's acquisition of Bay Cities, Bryant coordinated an exclusive interview with the Tampa Bay Business Journal (the "TBBJ").  The TBBJ is a local business-oriented publication that is published and distributed primarily in Tampa, Florida.  The TBBJ produced an article fairly summarizing the Acquisition, dated June 18, 2015, a copy of which is attached hereto as Exhibit "B."

9.      Centennial's significant business and financial investment in acquiring Bay Cities was predicated upon Centennial's ability to rely upon Bay Cities' existing management team to integrate the branches that it had acquired in Tampa Bay over a period of scarcely three (3) years.  Accordingly, five (5) senior officers of Bay Cities were retained by Centennial under specific management contracts, defined above as the Employment Agreements.

10.     In connection with the Acquisition, Centennial retained Bryant and most or all of the human resources of Bay Cities who Bryant recommended.  Centennial retained Bryant's right hand man, Pat Murrin ("Murrin"), who had served as Bay Cities' Chief Risk Manager and Executive Vice President prior to the Acquisition Date.  Centennial also retained Gwynn Davey ("Davey") who had served under Bryant as Bay Cities' Market President of Hillsborough County prior to the Acquisition Date.  For purposes of this Injunction Motion, Bryant, Murrin, and Davey are collectively defined as the "Former Senior Officers."  The retention of the Former Senior Officers was an integral part of the Acquisition contemplated by Centennial in acquiring Bay Cities.

11.     In connection with the Acquisition, each of the Former Senior Officers, joined in the execution and delivery of a "Resignation, Release and Terms of Employment" agreement (collectively, the "Employment Agreements"), as of the Announcement Date.  The Employment Agreements provided for the Former Senior Officers' resignation from Bay Cities and retention by Centennial in anticipation of the Acquisition Date.  A copy of the Employment Agreement relating to Bryant (the "Bryant Employment Agreement") is attached hereto as Exhibit "C."  A copy of the Employment Agreement relating to Murrin (the "Murrin Employment Agreement") is attached hereto as Exhibit "D." A copy of the Employment Agreement relating to Davey (the "Davey Employment Agreement") is attached hereto as Exhibit "E."

3

12. In joining in the execution of the Employment Agreements, Centennial and the Former Senior Officers each recognized the material importance to Centennial to reasonably restrict the Former Senior Officers' skills and talents in a competitive banking market. Centennial's acquisition of Bay Cities was predicated upon its ability to (a) maintain preexisting relationships with Customers, (b) preserve its going concern within the Tampa Bay "footprint" by maintaining Employees, and (c) ensuring the confidentiality of Confidential Information. Accordingly, the Employment Agreements included the Non-Compete Provisions, relating to confidentiality of Confidential Information, noncompetition, non-solicitation of Customers, and non-solicitation of Employees. The Non-Compete Provisions are contained primarily in sections 9 through 12 of each of the Employment Agreements, as fully.[1]

### B. Orchestrated Pattern and Scheme of Actionable Misconduct

13. On December 23, 2015, the Former Senior Officers joined with other key Employees who migrated from Bay Cities to Centennial, and received the balance of bonus compensation provided for under the Employment Agreements. The aggregate value of the bonuses paid to the Former Senior Officers was material, and was predicated upon their retention for long enough to effectively facilitate the integration of Bay Cities into Centennial. This sum further reflects Centennial's good faith commitment to the Tampa Bay Area, and its corporate intent to abide by its contractual relationships in the context of the Acquisition.

14. During or about January 2014, ServisFirst actively embarked upon a decision to strategically grow into the State of Florida, initially seeking correspondent bank relationships.[2] Bay Cities entered a correspondent relationship with ServisFirst during February of 2015, initiated by Bryant several months before the Announcement Date.

---

[1] All of the Employment Agreements contain a post-severance term of non-competition of one (1) year. The applicable geographic area of noncompetition and non-solicitation for Bryant includes Hillsborough, Pinellas, Manatee, and Sarasota Counties, Florida. The applicable geographic area of noncompetition and non-solicitation for Murrin and Davey is Hillsborough County, Florida. For purposes of this Injunction Motion, the two (2) specific geographic areas applicable under the respective Employment Agreements are together referred to as the "Territories." All of the Former Senior Officers have worked in and/or lived in Tampa, Florida for many years.

[2] The concept of a "Correspondent Bank Relationship" involves a relationship where a larger financial institution with broader resources and capacity provides a range of services to a smaller/community bank in an arrangement that is mutually beneficial. The concept of initiating correspondent banking relationships is to foster acquisitions when justified in light of all business considerations. In the ordinary course of its business, ServisFirst also uses the method of acquiring local executives as a method of geographic expansion.

4

15.     No later than October 29, 2015, Bryant began communicating with Bill Dacko ("Dacko"), a senior executive of ServisFirst, regarding business options inconsistent with Bryant's duties under the Bryant Employment Agreement.  The question of whether the initiative was by Dacko or Bryant is inconsequential, as by this time the Acquisition was complete and Dacko knew or should have known of the customary Non-Compete Provisions obligating Bryant to Centennial.

16.     During October of 2015, Dacko provided Bryant with a profile of ServisFirst on or before this date (the "ServisFirst Profile"), a copy of which is attached as Exhibit "F."  The ServisFirst Profile provides many insights as to the motivation of Dacko and ServisFirst for interfering with Centennial's contractual relations with the Former Senior Officers.

17.     During November of 2015, Dacko provided Bryant with a "Research Brief" (the "ServisFirst Research Brief"), a copy of which is attached hereto as Exhibit "G."  The ServisFirst Research Brief overviews ServisFirst's efforts to expand geographically from its Birmingham, Alabama headquarters to several other states, principally Florida.

18.     When the ServisFirst Profile and the ServisFirst Research Brief were provided to Bryant, ServisFirst's only Florida branches were located in Pensacola, Florida.   This fact is evidenced by documentation available on ServisFirst's website as of the date of this Injunction Motion, a copy of which is attached hereto as Exhibit "H."  However, by this time, Dacko had been assigned by ServisFirst for nearly two (2) years to facilitate expansion throughout Florida.   This fact is evidenced by a TBBJ article relating to Dacko's Tampa Bay mission on behalf of ServisFirst, dated January 27, 2014, a copy of which is attached hereto as Exhibit "I."

19.     On December 23, 2015, the Former Senior Officers joined with the rest of the Centennial team in receipt of year-end bonuses, in addition to those that were received by the Bay Cities teammates on the Acquisition Date.

20.     On December 31, 2015, (the "Resignation Date"), the Former Senior Officers simultaneously provided notices of resignation to Centennial.  Copies of each are respectively attached hereto as Composite Exhibit "J."  Jonathan Zunz ("Zunz"), a commercial lending officer and protégé of Davey, also submitted his

resignation simultaneously with the Former Senior Officers.  Although not sufficiently senior to justify an Employment Agreement, Zunz had relocated from Bay Cities to Centennial in connection with the Acquisition, and downloaded his entire loan portfolio in connection with his departure.  The manner in which the Former Senior Officers and Zunz resigned left little doubt that their departure had been choreographed with executive precision.  For example, in anticipation of his imminent departure, Bryant ordered a Centennial funded Dunn & Bradstreet report on Tampa-based business prospects that fit the ServisFirst profile, and the Centennial profile for that matter.

21.     On January 3, 2016, Bryant e-mailed all of his professional contacts advising them to "stay tuned."  The timing is significant, not only because he was clearly soliciting Customers three (3) days after the Resignation Date in violation of the Non-Compete Provision, but also because (i) he was utilizing a sensitive and proprietary distribution list that he has surreptitiously e-mailed from his Centennial e-mail address to a personal e-mail address two (2) weeks earlier, on December 18, 2015, and (ii) he received a large share of his Acquisition compensation only five (5) days after forwarding the prodigious contact list.

22.     As 2016 has progressed, Bryant has continued to stay in contact with the Customers.

23.     On January 4, 2016, shortly after the Resignation Date, the TBBJ carried a news article (the "Resignation Article"), a copy of which is attached hereto as Exhibit "K," reporting that Bryant and certain associates had resigned from Centennial, and once again including a "teaser" of sorts regarding speculation as to Bryant's next step.  The Resignation Article could not have been written without the assistance of Centennial, Bryant, or ServisFirst: Centennial had nothing to do with the article, and so it must have been based on information imparted by the Defendants.  Because of Bryant's prior role in lining up publicity via the TBBJ for both Bay Cities and Centennial, the Resignation Article was significant because it indicates that the Former Senior Officers and Zunz were all relocating somewhere together.

24.     Following receipt and review of the Resignation Article, Centennial made inquiries necessary to learn that Bryant and Dacko had apparently collaborated to form a local presence for ServisFirst in the Tampa Bay Area.  For himself and on behalf of ServisFirst, Bryant had apparently persuaded Murrin, Davey, and Zunz to leave Centennial as well.  By this time, Bryant was effectively acting on behalf of ServisFirst,

directing his cohorts as new agents of ServisFirst, and violating the Non-Compete Provisions within the Territories.

25.      On January 7, 2015 (the "Notice Date"), John W. Allison, the Chairman of the Board of Centennial, contacted Thomas A. Broughton, III, the CEO of ServisFirst, with a message having three (3) components:

    a.  Centennial has no objection to competition among financial institutions within Tampa Bay, including the arrival of ServisFirst.

    b.  Centennial has no objection to the Former Senior Officers exercising their rights to work with the employer of their choosing, including ServisFirst, provided that there is no actionable business activity within the Territories as delineated in the Employment Agreements.

    c.  Centennial reaffirms its intent to honor its obligations and enforce its rights under the Employment Agreements and under all applicable Florida law.

This message was effectively communicated at the highest level of both financial institutions.

26.      On January 11, 2016, Centennial sent a series of cease and desist letters (collectively, the "Cease and Desist Letters") to Bryant, Murrin, Davey, Zunz, and ServisFirst, copies of which are attached hereto as Composite Exhibit "L."  Following the transmission of the Cease and Desist Letters to Bryant, Murrin, Davey, and Zunz, Centennial confirmed that much of its concern regarding the departures were well founded.  For example:

    a.  Centennial reviewed ServisFirst's full back page advertisement appearing in the Friday, January 8, 2016 edition of the TBBJ, seeking employees in Tampa, where it presently has no branches, a copy of which is attached hereto as Exhibit "M."

    b.  Centennial reviewed yet another a TBBJ news story, e-mailed on January 11, 2016, confirming that Bryant had relocated to ServisFirst, from which it can be readily inferred that Murrin, Davey, and Zunz relocated as well, a copy of which is attached hereto as Exhibit "N."

    c.  Centennial was able to verify that three of the four relocated officers (Murrin does not actively utilize LinkedIn) had changed their LinkedIn profiles to reflect current employment at

ServisFirst in Tampa, copies of all four (4) relevant LinkedIn profiles are attached hereto as Composite Exhibit "O."

These developments, together with other research, has confirmed the nature of ServisFirst's solicitation and competition, with Bryant at the helm, in violation of the Non-Compete Provisions. For this reason, the last of the Cease and Desist Letters was sent to ServisFirst at the conclusion of January 11, 2016.

27. All requirements and conditions precedent to the bringing of this cause have been satisfied, performed, and/or waived by Centennial and/or the applicable Defendants. Centennial notes that the counts comprising this Injunction Motion include causes of action for damages as well as for equitable relief, and notwithstanding any other provision in this Injunction Motion, Centennial reserves the right to plead in the alternative to the extent consistent with the interests of the justice.

28. With respect to each cause of action set forth herein, the subject defaults, as hereafter alleged, have required Centennial to retain the undersigned law firm for purposes of initiating this cause. Centennial has agreed to pay the undersigned law firm a reasonable fee for its services rendered and costs incurred. With respect to the liabilities set forth herein, the attorneys' fees and costs incurred by Centennial in connection herewith are additionally components of the same.

## C. Consequences of Non-Compliance and Relief Requested

29. ServisFirst, under the present management of Bryant, with the support of Murrin, Davey, and Zunz, is now in direct competition with the Centennial and its remaining team. As extensions of ServisFirst, the Former Senior Officers have attempted to arrogate Customers, Employees, Confidential Information, and other recourses of Centennial. Through the Former Senior Officers, ServisFirst is soliciting the referral sources to transfer existing Customers, Employees, Confidential Information, and other recourses to ServisFirst at the unfair expense of Centennial.

30. Centennial depends upon its Customers, Employees, Confidential Information, and other recourses for the continued success of its business activities. Centennial has long standing relationships within the Territories that provide Centennial with a significant amount of banking and related securities referrals and

consultations.  Centennial is entitled to protect its relationships within the Territories and the benefits it derives from those relationships.

31.     Because Bryant has at all relevant times been the immediate supervisor of the other Former Senior Officers, and is directing all business activities for ServisFirst utilizing his existing management team, Centennial is seeking the full range of relief over all four relevant counties comprising the Territories, Pinellas, Hillsborough, Manatee, and Sarasota.

### D.  Events Transpiring Since Filing of the Complaint

32.     It has now become apparent that ServisFirst was well aware of the Non-Compete Provisions relating to the Former Senior Officers when they were hired as a group.  It is also apparent that ServisFirst takes the position that all of the Non-Compete Provisions are territorially limited.  However, a plain reading of the provisions themselves refutes this argument.  Those provisions, as set forth in the Bryant Employment Agreement most relevant in light of his managerial position, are as follows:

9. Confidentiality. Employee acknowledges that during his employment with BCB and Centennial, he has and will be provided with confidential information and trade secrets which are vital to the continued growth, profitability and success of Centennial.  Employee acknowledges that such information is or will be the property of Centennial and has economic value to Centennial by not being known by competitors or the public in general.  Employee hereby covenants to keep and maintain the information confidential, both during the Employee's employment and for one (1) year following any termination thereof.  Without limiting the generality of the forgoing, Employee agrees:

    (a)    to hold confidential information and trade secrets in strictest confidence;
    (b)    not to use, duplicate, reproduce, distribute, disclose or otherwise disseminate confidential information and trade secrets or any physical embodiments of confidential information and trade secrets; and
    (c)    in any event, not to take any action causing or fail to take any action necessary in order to prevent any information from losing its character or ceasing to qualify as confidential information or a trade secret.

Notwithstanding the foregoing, such information may be disclosed (i) to third parties if such information was then generally known to the public; (ii) to third parties if such information became known to the public through no fault of Employee; or (iii) as required by law.  In the event that the Employee is required by law to disclose any confidential information of trade secrets; Employee will not make such disclosure unless (and then only to the extent that) Employee has been advised by independent legal counsel that such disclosure is required by law and then only after prior written notice is given to Centennial when the Employee becomes aware that such disclosure has been requested and is required by law.  This paragraph 8 shall survive termination or expiration of this Agreement for one (1) year.

**10.  Non-competition.  Employee agrees that during the one (1) year period following the voluntary or involuntary termination of his employment, he will not (except on behalf of or with the prior written consent of Centennial), within the Territory, either directly or indirectly, on his own behalf or in the service of or on behalf of others, as an executive employee or in any other capacity which involves duties and responsibilities similar to those undertaken for Centennial (including as an organizer, director, or proposed executive officer of a new financial institution), engage in the banking business.  Territory is defined as the following counties in Florida:  Sarasota, Hillsborough, Manatee, and Pinellas.  In consideration of Employee's agreement to these restrictions as well as those set forth in Sections 11 and 12, Centennial will pay to Employee One Hundred Fifty Thousand Dollars ($150,000) in a lump sum on the Effective Date.**

11.  <u>Non-Solicitation of Customers</u>.  Employee agrees that during the one (1) year period following the voluntary or involuntary termination of his employment, he will not (except on behalf of or with the prior written consent of Centennial), on his own behalf or in the service of or on behalf of others, solicit, divert or appropriate or attempt to solicit, divert or appropriate, any business from any of Centennial's customers.

12.  <u>Non-Solicitation of Employees</u>.  Except for advertisements of general circulation that do not target the employees of Centennial, Employee agrees that during the one (1) year period following the voluntary or involuntary termination of his employment, he will not, on his own behalf or in the service of or on behalf of others, solicit, recruit or hire away or attempt to solicit, recruit or hire away, any employee of Centennial or its affiliates to another person or entity providing products or services that are competitive with Centennial, whether or not:

    (a)    such employee is a full-time employee or a temporary employee of Centennial or its affiliates;

    (b)    such employment is pursuant to written agreement, or

    (c)    such employment is for a determined period or is at will.

(emphasis supplied) Based upon the apparent position of ServisFirst regarding the Non-Compete Provisions as reflected in developments since filing the Complaint, it is important to note that the territorial limitations set forth in the contract language above are themselves limited, so as to provide broader relief to Centennial.  First, the territorial restrictions only relate to Section 10, and do not relate to Section 9 (confidentiality), Section 11 (non-solicitation of Customers), or Section 12 (non-solicitation of Employees).    Perhaps even more importantly, the territorial restriction set forth in Section 10 is not written in such a way as to allow the Defendants and their agents to act within the applicable Territory with impunity from just over a county line. Although some non-compete contracts prohibit opening an office, a branch, or some other unit within a particular prohibited service area, the Employment Agreements prohibit conduct that is "either directly or indirectly, on his own behalf or in the service of or on behalf of others…"    Significantly, Bryant's consideration for this section alone was $150,000.  The question of whether or not Bryant is breaching the

Non-Compete Provisions is not answered by reference to where he parks his car in the morning, but by the conduct that he initiates within Centennial's footprint after having received fully $2,831,269.25 to bring Centennial to the closing table for Bay Cities.

33.     On January 14, 2016, Centennial initiated this action against the Defendants seeking damages and equitable relief, including injunctive relief, based upon the Actionable Misconduct.  In response to being served with the Complaint and initial process later in the day, ServisFirst issued press releases that appeared in the TBBJ, a copy of which is attached hereto as Exhibit "P."  ServisFirst's official press release, that may be considered by this Court pursuant to Federal Rule of Evidence 801(d)(1), articulated by Thomas A Broughton, III, is as follows:

> ServisFirst is excited about the opening of its branch in Lutz and the team it has assembled. ServisFirst was aware of the agreement between Greg Bryant and Centennial and took steps to ensure that the agreement was and is appropriately honored.  ServisFirst communicated its intentions to Centennial. Despite that communication, Centennial's lawyer sent a lengthy letter to (me) on January 11 expressing concerns, and, on January 12, counsel for ServisFirst e-mailed Centennial's lawyer that ServisFirst would respond to that letter this week," Broughton said. "ServisFirst believes that, if Centennial would have waited for that response, it would have seen that its concerns and this lawsuit are unfounded. Now that suit has been filed, ServisFirst plans to vigorously defend itself and Mr. Bryant, and it will continue to compete with Centennial from its Lutz branch.

The press release is internally inconsistent because at the same time that ServisFirst contends that Centennial's concerns are unfounded, it also unabashedly admits that it will continue to compete with Centennial from a putative branch based in Lutz, in the Middle District of Florida.  Although the Defendants seem to derive comfort by the fact that they have opened a branch in Lutz as a base of competition with Centennial, rather than within the Territories that have relevance to this controversy in some respects, that comfort is improvident.  It is possible for the Former Senior Officers to breach the Non-Compete Provisions from anywhere on Earth by conducting themselves in the manner that they are at this time.

34.     As alleged above, Centennial has written the Cease and Desist Letters, referenced above as Exhibit "L," to all four (4) departed Centennial officers, all of whom are now confirmed to be employed by ServisFirst, and ServisFirst as well, asking for a return of documentation wrongfully taken from Centennial. Some of the things that have been taken constitute "data" and "trade secret information" for purposes of Florida Statutes § 815.01 et seq., as well as Florida Statutes § 812.01, et seq.  However, the press release of

ServisFirst strongly indicates that no compliance with the requests set forth in Cease and Desist Letters will be forthcoming.  The continued wrongful possession of these materials should not be permitted by this Court.

35.  There are several obvious concerns that Centennial has not only for itself but for others at this time:

a.  At the clear direction of ServisFirst and his seniors that deprated Centennial with him, Zunz has downloaded and is presumably using bank client information in violation of <u>Florida Statutes</u> § 655.059, that is intended to safeguard the secrecy and confidentiality of the banking information of the public.

b.  As reflected in Exhibit "M" above, ServisFirst took out its first ever advertisement that has been located by the undersigned, following diligent search, on January 8, 2016, seeking applicants for positions who may consider leaving secure positions only to become embroiled in questions as to whether or not ServisFirst and its new commercial lending team can poach with impunity from extreme southern Pasco County on some geographic pretext.

c.  A diligent search has been performed by the undersigned and their agents to verify that there is no record evidence of the existence of a putative ServisFirst branch in Lutz, Florida, or anywhere east of Escambia County, Florida.  Centennial does not wish incidental harm to third parties who may sign a lease, provide materials, or otherwise be part of the establishment of a branch predicated largely or exclusively on exploiting Centennial's Tampa-based business.

d.  Centennial notes that ServisFirst is aggressively ramping up its marketing campaign within Centennial's footprint with Bryant at the helm, having identified himself as CEO – Tampa Bay at ServisFirst, as evidenced on his LinkedIn page, included within Composite Exhibit "O" within.  There could be significant confusion in the event that customers, vendors, and others were to call upon ServisFirst only to find out that injunctive relief was impacting potential business plans.

## E.  Incorporated Memorandum of Law

### I.    Summary of Argument:

36.     ServisFirst has engaged in Actionable Misconduct by which the Former Senior Officers have left their senior positions at Centennial in an orchestrated manner in order to directly compete with Centennial as new employees of ServisFirst.   The Actionable Misconduct of ServisFirst has produced significant violations of the Non-Compete Provisions set forth in the Employment Agreements executed by each of the Former Senior Officers in favor of Centennial.   The Actionable Misconduct has interfered with Centennial's legitimate expectations regarding its Customers, Employees and Confidential Information, and will continue to interfere with the same if not enjoined.

### II.    Injunctive Relief:

37.     Rule 65 of the Federal Rules of Civil Procedures allows a court to enter temporary restraining orders. Fed. R. Civ. P. 65.  Furthermore, injunctive relief is an appropriate remedy in cases of common law tortious interference. See Heavener, Ogier Servs., Inc. v. R.W. Florida Region, Inc., 418 So.2d 1074, 1077 (Fla. 5th DCA 1982) (enjoining tortious interference by competing franchisors by prohibiting contact for the purpose of inducing a breach).  It is similarly appropriate to enjoining violations of a valid restrictive covenant contained within an employment agreement. Fla. Stat. § 542.335(1)(j).  To obtain temporary injunctive relief as requested by Centennial, a movant must show (1) a substantial likelihood of success on the merits; (2) irreparable injury will be suffered if the relief is not granted; (3) the threated injury outweighs the harm the relief would inflict on the non-movant; and (4) the entry of the relief would serve the public interest. See Schiavo ex. rel Schindler v. Schiavo, 403 F.3d 1223, 1225-26 (11th Cir. 2005); Technomedia Solutions, LLC v. Scopetto, No. 6:13-cv-1061, 2013 WL 6571558, at *6 (M.D. Fla. Dec. 13, 2013).  As discussed more thoroughly below, all the necessary elements are present for this Court to issue the injunctive relief requested by Centennial.

a. There is a Substantial Likelihood of Success on the Merits:

38.     To issue preliminary injunctive relief, "'a district court need not find that the evidence positively guarantees a final verdict' in favor of the movant." Siegel v. LePore, 234 F. 3d 1163, 1176 (11th Cir.

2000) (quoting Levi Strauss & Co. v. Sunrise Int'l Trading, Inc., 51 F. 3d 982, 985 (11th Cir. 1995). Centennial need only demonstrate a likelihood of success on the merits.

      i.   **Tortious Interference Claim Relating to Employment Agreements**:

39.     Under Florida common law, the elements of tortious interference with a business relationship are (1) the existence of a business relationship; (2) knowledge of the relationship on the part of the defendant; (3) an intentional and unjustified interference with the relationship by the defendant; and (4) damage to the plaintiff as a result of the breach of the relationship. Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc., 262 F.3d 1152, 1154 (11th Cir. 2001); Tamiami Trail Tours, Inc. v. Cotton, 463 So.2d 1126, 1127 (Fla. 1985). Each of these elements is present here.

40.     As noted above, in addition to the business relationships between Centennial and its Customers, Centennial and the Former Senior Officers entered into valid Employment Agreements which contain Non-Compete Provisions. See Ex. "C" – "E."  ServisFirst is aware of Centennial's business relationships with the Former Senior Officers.  SevisFirst knew that the Former Senior Officers were all employees of Centennial at the time ServisFirst first began communicating with Bryant on October 29, 2015 through its agent Dacko.  Furthermore, Bryant is aware that the Former Senior Officers were employed by Centennial under Employment Agreements restricting their post-severance conduct.

41.     Despite the Defendants' knowledge, the Defendants' intentionally and unjustifiably interfered with Centennial's relationships with the Former Senior Officers causing the Former Senior Officers to leave their respective positions at Centennial.  Not only have the Defendants' caused the Former Senior Officers to resign, but ServisFirst continues, through the direction of Bryant, to encourage the Former Senior Officers to violate the Non-Compete Provisions of the Employment Agreements, while at the same time taking advantage of the Confidential Information and goodwill obtained by the Former Senior Officers while employed at Centennial.  It is undisputed that SevisFirst operates no banking business within the Tampa Bay area and therefore holds no privilege to interfere with Centennial's business relationships. Heavener, Ogier Servs., 418 So.2d at 1077 ("where a defendant has no prior economic interest of his own to safeguard but only a

prospective business advantage that is not yet realized, the defendant has no such privilege to interfere with an existing contract").

42.     The Defendants are improperly interfering with Centennial's business relationships maintained with its Employees.  The Defendants Actionable Misconduct is carried out in order to improperly utilize the Confidential Information obtained by the Former Senior Officers while employed at Centennial to branch into the Tampa Bay area and engage in competing banking business within the Territories.  If the Defendants are not enjoined from their efforts to interfere with Centennial's valid business relationships, the damage to Centennial will be severe and result in the loss of the Former Senior Officers and the competitive advantage within the Territories Centennial bargained for when it entered into the Merger Agreement.

ii.   **Tortious Interference Claim Relating to Prospective Business Advantage:**

43.     The elements of a cause of action based on tortious interference with a prospective business advantage are (1) the existence of a valid business relationship or expectancy; (2) knowledge of the relationship or expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage. National R.R. Passenger Corp. v. Veolia Transp. Services, Inc., 592 F.Supp.2d 86, 98 (D.C. Cir. 2009) (noting that the standard for pleading a claim for tortious interference with a business advantage is the same under Florida law as it is under District of Columbia law); See Walters v. Blankenship, 931 So. 2d 137, 139 (Fla. Dist. Ct. App. 2006).

44.     It is undisputed that Centennial had a valid business expectancy derived from the Acquisition. Centennial paid a record amount of approximately $101,600,000 in connection with the Acquisition which was predicated upon Centennial's ability to rely upon Bay Cities' existing management team to integrate the branches that it had acquired in Tampa Bay.  Centennial had the expectancy to maintain, inter alia, the employees, assets, and goodwill associated with Bay City post-Acquisition.  ServisFirst had ample knowledge of the Acquisition at the time it tortuously interfered with Centennial's business advantage.

45.     As a result of ServisFirst tortious interference, the Former Senior Officers, who were an integral part of the Acquisition, resigned from Centennial and have now taken senior possessions within ServisFirst.  Additionally, the Defendants, through the Former Senior Officers, have begun soliciting the

referral sources to transfer existing Customers, Confidential Information, and other recourses to ServisFirst and have produced at least four (4) Employee departures thus far, all at the expense of Centennial.  Centennial has spent an exorbitant amount of time and money fostering and maintaining the relationships it holds with its Employees, Customers, and the Tampa Bay community at large.  This inappropriate and unfair conduct on behalf of the Defendants has and will continue to damage Centennial's business advantage within the Tampa Bay area.

      iii.  **Validity of Non-Compete Provisions:**

46.    Under Florida law, a restrictive covenant is valid if the restrictive covenant is reasonable as to time, area, and line of business. New Horizons Computer Learning Centers, Inc. v. Silicon Valley Training Partners, Inc., No. 2:02-cv-459, 2003 WL 23654790, *5 (M.D. Fla. Nov. 12, 2003).  Additionally, an employer seeking to enforce a restrictive covenant must prove (1) the existence of one or more legitimate business interest justifying the covenant and (2) that the contractually specified restraint is reasonably necessary to protect the established business interest of the employer. Fla. Stat. § 542.335; See also Technomedia Solutions, No. 6:13-cv-1061, 2013 WL 6571558, at *10 (M.D. Fla. Dec. 13, 2013); Medi-Weightloss Franchising USA, LLC v. Medi-Weightloss Clinic of Boca Raton, LLC, et al., No. 8:11-cv-2437, 2012 WL 260902, *4 (M.D. Fla. Jan. 3, 2012); Autonation, Inc. v. O'Brien, 347 F. Supp. 2d 1299, 1304 (S.D. Fla. 2004).  The term "legitimate business interests" includes, but is not limited to: valuable confidential business information, substantial relationships with prospective or existing customers or clients, and extraordinary or specialized training. Id.

      1)  *Confidential Business Information*

47.    In Florida, confidential business and professional information are considered legitimate business interest that can be protected by restrictive covenants in employment contracts.  Fla. Stat. § 542(335)(1)(b).  The Eleventh Circuit has held that "when an employee has access to confidential business information crucial to the success of the employer's business, that employer has a strong interest in enforcing a covenant not to compete." Proudfoot Consulting Co. v. Gordon, 576 F.3d 1223, 1234 (11th Cir. 2009).

48.     In Proudfoot, the Eleventh Circuit found the plaintiff to have a legitimate business interest in its confidential business information justifying enforcing a covenant not to compete.  There, the confidential information included information about the employer's clients, its general operations, pricing information, training materials, and methods for providing its services. Proudfoot, 576 F.3d at *1233-34.

49.     Prior to their decision to depart, the Former Senior Officers were provided access with valuable Confidential Information, of much the same type as that described in Proudfoot, as an ongoing investment designed to give Centennial an advantage over its competitors.

50.     At this juncture it is not necessary for Centennial to establish that the Former Senior Officers have breached the confidential information clause by improperly retaining and using the Confidential Information to the detriment of Centennial. Id.  The mere fact that the Former Senior Officers are now working with ServisFirst, a competitor to Centennial, is sufficient evidence to show that the Confidential Information received by the Former Senior Officers is endangered of being misappropriated. Id. at *1334-36.  Therefore, the fact that the Former Senior Officers could use the Confidential Information to give ServisFirst an unfair advantage presents a substantial likelihood that Centennial will be able to establish a legitimate business interest in the Confidential Information and therefore a likelihood of success on the merits.

### 2)   *Substantial Relationships With Existing Customers and Employees*

51.     Substantial relationships with specific prospective and existing customers as well as customer goodwill are both legitimate business purposes recognized under Florida law.  Fla. Stat. § 542(335)(1)(b)3-4; North American Products Corporation v. Moore, et. al., 196 F.Supp.2d 1217, 1230-31 (M.D. Fla. 2002) ("The focus of preliminary injunctive relief is on maintaining long standing relationships and preserving the goodwill of a company built up over the course of years of doing business").  As such, Centennial is entitled to protect the goodwill that it has established with its Customers. Technomedia Solutions, No. 6:13-cv-1061, 2013 WL 6571558, at *12.

52.     As set out above, Centennial has invested substantially in the development of its Customers, Employees, Confidential Information, and other recourses.  Furthermore, Centennial has developed an enormous amount of goodwill in the Territories.  The Defendants, through the Former Senior Officers, have

attempted to disrupt Centennial's relationships that it holds with its Customers and the goodwill it maintains within the Territories by improperly attempting to solicit Centennial's Customers.   Under Florida law, Centennial has a legitimate business interest in prohibiting such solicitation. Technomedia Solutions, No. 6:13-cv-1061, 2013 WL 6571558, at *11.  It is not necessary for Centennial to prove that the Former Senior Officers had a substantial relationship with any particular customer. Milner Voice Data, Inc. v. Tassy, 377 F. Supp. 2d 1209, 1217 (S.D. Fla. 2005).  It is enough that the Former Senior Officers were each responsible for client relationships and had access to Confidential Information which included confidential information regarding Centennial's Customers. Technomedia Solutions, No. 6:13-cv-1061, 2013 WL 6571558, at *11 ("an employer has a legitimate business interest "[w]here an employee … gains substantial knowledge of h[er] former employer's customers, their purchasing history, and their needs and specifications'").

### 3) *Reasonable Necessity of the Restrictive Covenant*

53.     To be enforceable, restrictive covenants must be reasonable with regard to time, area, and line of business. Fla. Stat. § 542.335(1).  A court shall presume reasonable in time any restraint six (6) months or less in duration and shall presume unreasonable in time any restraint more than two (2) years in duration.  Fla. Stat. § 542.335(1).

54.     All of the Employment Agreements contain a post-severance term of noncompetition of one (1) year, which is presumptively not unreasonable. Id.; New Horizons, No. 2:02-cv-459, 2003 WL 23654790, *6 (court found the one (1) year time restraint in the restrictive covenant to be reasonable under the Florida Statutes); Environmental Services, Inc. v. Carter, 9 So.3d 1258, 1263 (Fla. 5th DCA 2009) (same); Technomedia Solutions, No. 6:13-cv-1061, 2013 WL 6571558, at *11 (court found a two (2) year time restraint to be reasonable).

55.     The one (1) year time limit is extremely reasonable given the length of time it may take Centennial to reconstitute the management team it undertook to preserve in the Acquisition.  Additionally, one (1) year is a reasonable amount of time for Centennial to attempt to retain its Customer base using its existing senior executives, while at the same time introducing new senior executives to the community.  The Florida Supreme Court has held that non-compete agreements involving comparable industries for a one (1) year

period are generally upheld as reasonable and that many courts have upheld much longer periods of times in contracts affecting sales representatives. Akey v. Murphy, 238 So.2d 94, 96 (Fla. 1970); See also Supinksi M.D., 853 So.2d 526 (finding a two (2) year restriction in a non-compete agreement to be reasonable and enforceable).

56.     With respect to the geographic restriction of the Employment Agreements, Florida courts typically choose to enforce restrictive covenants that encompass the area in which the former employee conducted business for the employer. See generally Milner Voice, 377 F. Supp. 2d at 1217 (finding a non-competition agreement limited to the geographic area where the defendants conducted their previous activities under employment was reasonable); Open Magnetic Imaging, Inc. v. Nieves-Garcia, 826 So. 2d 415 (Fla. 3d DCA 2002) (finding that a non-compete agreement was overbroad where it encompassed three (3) counties where the employee only worked within one (1) county).  Bryant had substantial contact with the Territories as he was the former Tampa Bay area President for Centennial and oversaw Centennial operations within the Territories.   Thus, the geographic restrictions are certainly reasonable under prevailing Florida law. Xerographics, Inc. v. Thomas, 537 So.2d 140, 143 (Fla. 2nd DCA 1988) (finding that a five (5) county restriction in Florida was reasonable).

57.     On a pertinent note, the geographic restriction contained within the Non-Compete Provisions prohibits the Former Senior Officers from engaging in banking business within the Territories. See Ex. "C" – "E" (emphasis added).  It does not allow the Former Senior Officers to merely relocate outside the Territories and continue to engage in banking business within the Territories as though the present location of the Former Senior Officer's somehow circumvents the geographic restrictions and therefore eviscerates the Non-Compete Provisions.   While certain Florida courts have found non-compete agreements unviolated when a former employee relocates outside the restrictive geographic area but continues to provide services within the geographic area, the determination falls upon the clear language of the respective non-compete agreement. See e.g. Heiderich v. Florida Equine Veterinary Services, Inc., 86 So.3d 527 (Fla. 5th DCA 2012); Tam-Bay Realty, Inc. v. Ross, 534 So.2d 1200 (Fla. 2nd DCA 1988).

58.     In <u>Heiderich</u>, the appellant was a party to a non-compete provision which mandated that the appellant "shall not own, manage, operate, control, be employed by, assist, participate in, or have any mater interest in any business or profession engaged in general equine veterinary practice located within a thirty (30) miles radius …." 86 So.3d at 528.   The appellee brought suit when it learned the appellant was providing equine veterinary services within the geographic area.   The court, in reversing the trial courts ruling, held that since the appellant operated her veterinary practice outside the thirty (30) mile radius, and the non-compete did not prohibit the appellant from providing equine veterinary services within the geographic area, the appellant was not in violation of the non-compete. <u>Id</u>.

59.     Similar to the decision in <u>Heiderich</u>, the court in <u>Tam-Bay Realty</u> reversed the trial court's ruling and found that the non-compete agreement, which prevented the appellants from "opening, operating, serving as an officer, director or other employee of any real estate brokerage business located within the geographic boundaries," did not preclude the appellants from competing with the appellee within the geographic area from a business located outside the geographic boundaries set within the non-compete agreement. 534 So.2d at 1201.

60.     The Defendants are under the impression that since they are operating outside the Territories in Pasco, the Former Senior Officers are not in violation of the Non-Compete Provisions. <u>See</u> Ex. "P." However, the Defendants' mistake lies in their misinterpretation of the Non-Compete Provisions.   In both <u>Heiderich</u> and <u>Tam-Bay Realty</u>, the courts' decisions were predicated upon the specific language of the respective non-compete agreement.   In this instance, the Non-Compete Provision prevents the Former Senior Officers from "either directly or indirectly, on [their] own behalf or in the service of or on behalf of others, as an executive employee or in any other capacity which involves duties and responsibilities similar to those undertaken for Centennial … <u>engage in</u> the banking business" within the Territory." <u>See</u> Ex. "C" – "E."   There is no requirement that the Former Senior Officers themselves must be located within the Territories. Therefore, while the <u>Heiderich</u> and <u>Tam-Bay Realty</u> found no violation of the non-compete agreements on the sheer fact that the same did not preclude the former employees from offering certain services in the restricted geographic area; in this instance the Non-Compete Provisions does exactly that.   So long as the Former Senior

Officers are engaging in banking business within the Territories the Former Senior Officers are in violation of the Non-Compete Provisions.

b. **Centennial Will Suffer Irreparable Harm if the Injunction is Not Granted:**

61.     If the requested relief is not granted, Centennial will face a substantial threat of irreparable injury as explained above.  Under Florida law, the "violation of an enforceable restrictive covenant creates a presumption of irreparable injury," and the non-moving party bears the burden of rebutting that presumption. Fla. Stat. § 542.335(1)(j); Technomedia Solutions, No. 6:13-cv-1061, 2013 WL 6571558, at *16; New Horizons, No. 2:02-cv-459, 2003 WL 23654790, *7; Variable Annuity Life Ins. Co. v. Hausinger, 927 So. 2d 243, 245 (Fla. 2d DCA 2006) ("'[A] party seeking to enforce a restrictive covenant by injunction need not directly prove that the defendant's specific activities will cause irreparable injury if not enjoined …' the statue operates to create a presumption of irreparable injury to the employer and … the burden shifted to [the employee] to establish the absence of such injury.") (quoting America 11 Electronics, Inc., 830 So.2d 906, 908 (Fla. 2d DCA 2002)).  The Defendants, through the Former Senior Officers, have continued to attempt to access Confidential Information, poach Centennial Employees and have attempted to obtain information to solicit Customers, all in violation of the Non-Compete Provisions.  Further, once the Confidential Information is disseminated within ServisFirst, the Confidential Information cannot be undone and Centennial will have unfairly lost its competitive advantage in the Territories.  The Defendants' actions have caused and are continuing to cause Centennial to suffer damage to its reputation and goodwill in the Territories.  The Defendants will continue to breach the Non-Compete Provisions unless enjoined.  See Ex. "P."

c. **Balancing of Interests Weighs in Favor of Granting the Injunction:**

62.     Centennial's potential irreparable injury significantly outweighs any harm that would come to the Defendants.  The Former Senior Officers were privy to Centennial's Confidential Information which could be used to the detriment of Centennial considering the Former Senior Officers have accepted positions at ServisFirst.  The use of such information by ServisFirst, a direct competitor to Centennial, would provide an unfair advantage in ServisFirst's efforts to compete with Centennial. See Autonation, 347 F. Supp. 2d at 1308; Continental Group, Inc. v. KW Property Management, LLC, 622 F. Supp. 2d 1357, 1377 (S.D. Fla. 2009)

(finding that the retention of confidential information taken by the employee and given to the defendant tortious interferer does provide a threat of future harm to the plaintiff).  Furthermore, as extensions of ServisFirst, the Former Senior Officers have attempted to arrogate Customers, Employees, Confidential Information, and other recourses of Centennial.

63.     The injunction merely prevents the Defendants from taking any action that would run afoul of the Employment Agreements and the valid Non-Compete Provisions.  The Defendants knew of the existence of the Non-Compete Provisions at all relevant times.  Instead of adhering to the Employment Agreements, the Defendants chose to take action in violation of the Employment Agreements and to the detriment of Centennial.  The Defendants were aware of the potential harm that could befall upon them if they began to violate the Non-Compete Provisions.  The Defendants have not invested substantial time and money like Centennial has in procuring the Confidential Information and goodwill it holds in the Territories.  The Defendants will be able to save time and money by misappropriating the Confidential Information and continuously breach the Non-Compete Provisions unless they are enjoined.

   d.  **An Injunction will Advance the Public Interest**:

64.     Florida allows for the enforcement of non-compete and non-solicitation agreements and does not consider such enforcement to be contrary to the public interest. See Autonation, 347 F. Supp. 2d at 1308; See also Technomedia Solutions, No. 6:13-cv-1061, 2013 WL 6571558, at *17.  The very purpose of Florida Statute § 542.335 is to "allow employers to prevent their employees and agents from learning their trade secrets, befriending their customers and then moving into competition with them." Miller Mechanical, Inc. v. Ruth, 300 So. 2d 11, 12 (Fla. 1974).

65.     The public interest is clearly served by "enforcing valid contractual provisions freely entered into by the parties, by promoting stability and certainty in business relationships, by enforcing non-compete covenants permissible under Florida law,… and by protecting confidential, proprietary, and trade secret information of businesses." Medi-Weightloss, No. 8:11-cv-2437, 2012 WL 260902, *9.  Furthermore, the public interest is served by protecting the Confidential Information and enjoining the Defendants from improperly and unfairly using the Confidential Information to the detriment of Centennial. Id.

### F.  Concluding Remarks:

66.     As more thoroughly explained above, the Defendants have harmed Centennial, and continue to pose an unfair risk to the business plan and contractual relationships and expectations of Centennial, by reason of their tortious interference with the contractual relations of Centennial, and with its prospective business advantage as it relates to Employees, Customers, and the public of Tampa Bay.  ServisFirst has knowingly and intentionally induced the Former Senior Officers to breach their contractual obligations to Centennial. Conversely, Bryant has been the primary local decision-maker for ServisFirst, willfully causing not only his own breach of the Bryant Employment Agreement, but ServisFirst's tortious interference with the Murrin Employment Agreement and the Davey Employment Agreement.  Centennial will continue to suffer irreparable harm if the Actionable Misconduct does not cease.

WHEREFORE, Centennial respectfully requests that this Court enter a temporary restraining order, in substantially the same form as Exhibit "Q," against the Defendants, restraining them from all Actionable Misconduct referenced above, including, without limitation, the following:

a.     the Defendants must be enjoined from authorizing or directing the Former Senior Officers from using any Confidential Information derived from their tenure at Centennial and Bay Cities;

b.     the Defendants must be enjoined from acting, by or through the Former Senior Officers,  to access records of Centennial that constitute Confidential Information of Centennial;

c.     the Defendants must be enjoined from competing with Centennial, by or through the Former Senior Officers;

d.     the Defendants must be enjoined from soliciting Customers, by or through the Former Senior Officers;

e.     the Defendants must be enjoined from soliciting Employees, by or through the Former Senior Officers;

f.      the Defendants must be enjoined from otherwise authorizing or directing Bryant, in

the exercise of his management responsibilities at ServisFirst, to breach his duties to

Centennial under the Bryant Employment Agreement;

g.      the Defendants must be enjoined from otherwise authorizing or directing Murrin, in

the exercise of his management responsibilities at ServisFirst, to breach his duties to

Centennial under the Murrin Employment Agreement;

h.      the Defendants must be enjoined from otherwise authorizing or directing Davey, in the

exercise of her management responsibilities at ServisFirst, to breach her duties to

Centennial under the Davey Employment Agreement; and

i.      the granting of an award of attorneys' fees and costs in a manner consistent with

Florida Statutes § 542.335, and other applicable law.

Dated this 15th day of January, 2016.

/s/ John A. Anthony_____
**JOHN A. ANTHONY, ESQUIRE**
Florida Bar No. 0731013
**ANDREW J. GHEKAS, ESQUIRE**
Florida Bar No. 0119169
Anthony & Partners, LLC
201 N. Franklin Street, Suite 2800
Tampa, Florida  33602
Telephone:  813/273-5616/Facsimile:  813/221-4113
Attorneys for Centennial

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via electronic

means and/or U.S. Mail on the 15th day of January, 2016, to:

SERVISFIRST BANK, INC.                    Michael T. Sansbury, Esq.
c/o Rex McKinney                          Spotswood Sansom & Sansbury
316 South Balen Street                    1819 Fifth Avenue North
Pensacola, FL 32502                       Suite 1050
                                          Birmingham, AL 35203

Gregory W. Bryant
13023 Whisper Sound
Tampa, FL 33618

/s/ John A. Anthony_____
**ATTORNEY**

24

## VERIFICATION

STATE OF ARKANSAS

COUNTY OF PULASKI

I, Bob Birch, Regional President for Centennial Bank, hereby declares under penalty of perjury under the laws of the United States that the information contained in " Centennial's Verified Motion for Temporary Restraining Order and Injunctive Relief with Incorporated Memorandum of Law" (the " Injunction Motion") is true and correct, provided that this declaration does not extend to paragraphs that contain analysis of Florida law governing the merits of the Injunction Motion (including, primarily Section D and its subparts, as well as the request for relief at the base oe the Injunctmon Motion), about which I am unqualified to opine because I am not a member of the Florida Bar

BOB BIRCH

STATE OF ARKANSAS

COUNTY OF PULASKI

The foregoing instrument was acknowledged before me, this 15th day of January, 2016, by Bob Birch, in his capacity as Regional President for Centennial Bank. He is personally known to me.

Notary Public
My Commission Expires: 7-31-2025

25