IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CENTENNIAL BANK, an
Arkansas state chartered bank,

    Plaintiff,

vs.                                                  CASE NO. 8:16-cv-00088-CEH-JSS

SERVISFIRST BANK INC., an Alabama
state chartered bank, and GREGORY W.
BRYANT, an individual,

    Defendants.
_____/

**CENTENNIAL'S MID-HEARING MOTION TO PERMIT PROFFERED EXHIBITS SHOULD REFRESHMENT OF RECOLLECTION OR IMPEACHMENT BE NECESSARY**

        Pursuant to Federal Rules of Evidence 612, 613, 103(a)(2), and other applicable law, Centennial Bank ("Centennial"), as successor in interest to Bay Cities Bank ("Bay Cities"), moves on the following grounds for the order of this Court that will permit Centennial to introduce certain exhibits (the "Proffered Exhibits") in connection with the hostile direct examination of Gregory W. Bryant ("Bryant"), the current area President for the Tampa Bay Market Area of ServisFirst Bank Inc. ("ServisFirst"), in connection with the ongoing hearing pending before the Honorable Magistrate Judge Julie S. Sneed, to consider "Centennial's Verified Motion for Temporary Restraining Order and Injunctive Relief with Incorporated Memorandum of Law" [Doc. No. 4] (the "Injunction Motion") and objections to the same filed by ServisFirst and Bryant (together, the "Defendants") [Doc. Nos. 35, 36] (together, the "Injunction Objections"), such hearing now scheduled to resume at 9:30 a.m. on Thursday, April 28, 2016:

                              A.        **BRIEF PROCEDURAL OVERVIEW**

        1.        On January 14, 2016, Centennial initiated this cause on an expedited basis. Counsel had been retained only a few days prior, and was directed by Centennial to seek immediate injunctive

relief in connection with unfair competition activities of the Defendants violative of Florida Statutes § 544.335(1)(J) and other applicable law. The Injunction Motion was filed immediately after a case number was assigned to this cause, and necessarily does not include (a) events transpiring after its filing or (b) documents discovered after its filing.[1]

2. The fact that the Injunction Motion was filed immediately upon Centennial learning the basic facts giving rise to this cause necessarily means that significant information was derived immediately after the cause was initiated, much of which was incorporated into an amended version of the complaint [Doc. No. 53] (the "Amended Complaint") filed on February 19, 2016. During most of the 103 days that have elapsed since filing the Injunction Motion, Centennial has been unable to conduct discovery because the Defendants refused to conduct a Rule 26 conference until ordered to do so by this Court; however, Centennial has busily conducted its own investigation to the extent practicable under the leadership of Bob Birch ("Birch"), its Regional President.

3. In response to the Injunction Motion, the Defendants have filed five (5) affidavits of record in opposition to the same, copies of which are attached hereto as Composite Exhibit "A." Those affidavits are sworn by Bryant, Patrick Murrin, Gwynn Davey, Jonathan Zunz, and Thomas Broughton III. Mr. Broughton is the CEO and President of ServisFirst, and the remaining four individuals are officers of ServisFirst who migrated as a group from Centennial on December 31, 2015 (collectively, the "Bryant Team").

4. On April 26, 2016, this Court commenced the hearing to consider the Injunction Motion and the Injunction Objections (collectively, the "Injunction Pleadings"). The Defendants have provided no additional response to the Injunction Motion since the Injunction Objections were filed on February 11, 2016; however, the Defendants' tenor and content in colloquy and cross-

---

[1] This Court's consideration of the same has been delayed, the first two (2) times on the Defendants' motion and thereafter twice for other reasons.

examination of Birch provides Centennial direction in connection with the likely anticipated testimony of the second and final witness at the hearing, Bryant.

5. When the hearing adjourned for the day, the Court directed counsel and their clients to make best efforts to deal with the evidentiary issue presented by this motion, namely, the extent to which exhibits could be utilized by Centennial in the examination of Bryant, who is anticipated to be a hostile witness on direct examination.

6. The issue as to the ability of Centennial to utilize exhibits in the cross examination of Bryant is impacted by that portion of Local Rule 4.06 requiring parties seeking injunctive relief to attach to their motions all documents relied upon as exhibits. For timing reasons referenced above, Centennial did not attach every exhibit to the Injunction Motion that it knew about when the Amended Complaint was filed four (4) weeks later. The Local Rules may be flexibly applied in discretion of the Court. The Court's discretion on how to apply the Local Rules is reflected in two (2) orders of this Court entered by the Honorable Judge Charlene Edwards Honeywell (together, the "Exhibit Orders"), that are directly relevant to the relief requested herein.[2] Specifically, the Exhibit Orders provided that Centennial could utilize all of the exhibits to the Amended Complaint in lieu of just those exhibits filed with the initial complaint and the Injunction Motion.[3]

7. Based upon the directives in the Exhibit Orders, Centennial began the first day of the hearing on the Injunction Pleadings by successfully admitting into the record the majority of the exhibits to the Amended Complaint, all of which are collectively referred to herein as the "Admitted Exhibits."[4]

---

[2] The Exhibit Orders consist of the "Order" [Doc. No. 64], entered on February 26, 2016, and the "Order" [Doc. No. 75], entered on March 15, 2016.
[3] When each of the Exhibit Orders was entered, ample notice under Local Rule 4.06 of the exhibits to the Amended Complaint was being afforded to the Defendants based upon the timing of their entry.
[4] As the hearing continues, Centennial will likely seek introduction of some additional exhibits found as exhibits to the Amended Complaint in a manner consistent with the Exhibit Orders at the continued hearing. However, at this point, it is clear that Centennial is only relying on the exhibits to the Amended Complaint, including primarily the Admitted Exhibits, in support of the relief requested.

8. With all but thirteen (13) exhibits to the Amended Complaint now having been admitted[5] and "relied upon" by Centennial as that term is utilized in Local Rule 4.06, it is nevertheless clear that the Proffered Exhibits may appropriately be utilized under Federal Rule of Evidence 612 and 613 for Bryant's examination under oath as an hostile witness based upon the fact that he objects to all relief requested in the Injunction Motion.

9. In support of the relief requested by Centennial, the following is clear mid-hearing:

   a. **Birch Testimony**: Birch's testimony supported all relief requested in the Injunction Motion, and articulated the gravamen of the Amended Complaint. Additionally, Birch testified that he has reviewed approximately 25,000 items left behind on the Bay Cities and Centennial computer systems by the Bryant Team, which migrated from Centennial to ServisFirst on New Year's Eve, 2015. Some of the documents discovered by Birch are among the Proffered Exhibits, the same having been identified following the filing of the Injunction Motion.

   b. **Defendants' Discovery Compliance**: As soon as the Defendants complied with the order of this Court[6] requiring the Rule 26 conference that is a condition precedent to the commencement of discovery in this cause, Centennial propounded extensive discovery not only to the Defendants but to individuals and entities closely connected with them.[7] However, it is now clear that Mr. Murrin and Ms. Davey have "wiped clean" their e-mails as of December 31, 2015, as confirmed by ServisFirst counsel in an e-mail attached as Exhibit "B." Additionally, the Bryant Team has refused to provide their indemnification

---

[5] Those exhibits to the Amended Complaint not yet admitted by this Court are Exhibits "4," "9," "11," "14," "15," "16," "17," "20," "21," "22," "24," "25," "26," "28," "29," and "30."

[6] On motion of Centennial, this Court entered its "Order on Plaintiff's Motion to Compel Rule 26 Conference" [Doc. 68], on March 1, 2016, requiring case management conference on or before March 14, 2016.

[7] Each of the Subpoenas are entitled "Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action," but each is directed to a single individual or entity, including CenterState Bank, Fidelity Bank, Ernest Pinner, John Corbett, Patrick Murrin, Gwynn Davey, Jonathan Zunz, Igler Pearlman, P.A., Catapult Solutions, LLC, Catapult Funding, LLC, Catapult ALF 1, LLC, and Catapult ALF 2, LLC.

agreements with ServisFirst, executed on December 31, 2015, on the grounds that they were "prepared in anticipation of litigation." In all, in response to twelve (12) subpoenas directed to parties related to the Defendants, and four (4) items of discovery directed to the Defendants, only a few pages of documents have been produced although a plethora of objections have been served. The fact that the Defendants are willfully withholding documents because of the pendency of this hearing is inescapable, just as it is clear that the Defendants could have served discovery at the same time as Centennial and gotten the documents it now claims surprise and prejudice them. The only response worth reporting that was timely is Bryant's interrogatory responses that were received on the night before the hearing, a copy of which is attached as Exhibit "C."

c. **Discovery from Banks that Rejected Bryant Team**: Through Birch's testimony, it has been established that Bryant negotiated on behalf of himself and three (3) of his subordinates at Bay Cities, during the time that he was CEO, board member, and president of Bay Cities, for all four (4) individuals (collectively, the "Bryant Team") to interview as a group at Fidelity Bank ("Fidelity") and then again at CenterState Bank ("CenterState"), before the entire Bryant Team was hired as a group on December 11, 2015 by ServisFirst. Unlike the twelve (12) subpoenas referenced in subsection b. above, both Fidelity and CenterState made substantial production in response to the subpoenas with objections primarily for attorney-client privilege. The production from Fidelity and CenterState was produced with redactions by Centennial to the Defendants as courtesy even though the Defendants have intentionally failed to serve any discovery during the pendency of this cause. Copies of all such documents from

5

        Fidelity and CenterState are respectively attached hereto as Composite Exhibits "D" and "E."

   d. **The Nature of the Proffered Exhibits**: The gravamen of the Amended Complaint is that Centennial is the victim of an orchestrated plan to deprive it of the benefits of the bargain it reached in acquiring Bay Cities, due to the Defendants' stealth in perpetuating fraudulent and otherwise improper conduct. It is significant and ironic that all of the Proffered Exhibits are documents that Bryant either authored or received at some point when (i) Bryant first began his betrayal of Bay Cities while he was in the unique fiduciary capacity as President, CEO, and board member of that financial institution, (ii) Bryant was the Tampa Market Area President for Centennial, with a different but significant set of duties to Centennial, or (iii) Bryant was the Tampa Market Area President for ServisFirst, with dual and conflicting duties in connection with his current responsibilities for ServisFirst and his continuing responsibilities to Centennial and Bay Cities. No surprise can be claimed by Bryant, and none by ServisFirst unless it is not communicating with its Florida-based most senior officer.

10. Based upon all of the foregoing, Centennial has concluded that there is a possibility Bryant may be forgetful, inaccurate, disingenuous, or otherwise subject to impeachment for the continuation of the hearing. Accordingly, while Centennial relies upon no other exhibits whatsoever in support of the relief requested, Centennial urges that in appropriate circumstances it may be absolutely necessary for Centennial to be able to utilize additional documents obtained since the filing of the Injunction Motion three (3) months ago in order to address testimony of Bryant that is partial or inconsistent with the facts underlying this controversy. The only way that the Proffered Exhibits might be introduced is if Bryant opens the door in a manner that requires relief in the interests of justice.

6

11. During the days leading up to the first day of hearing on the Injunction Pleadings, counsel for Bryant and Centennial have traded a plethora of e-mails and calls to address a fundamental dispute in which (a) Centennial contends that the Local Rules cannot be applied in a manner that eviscerates Centennial's rights under the Federal Rules of Evidence, and (b) Bryant contends that the Exhibit Orders require Centennial to imagine and anticipate every way that Bryant might speak so as to open himself up to searing impeachment. Copies of those e-mail communications are attached hereto as Composite Exhibit "F."

12. At the pretrial conference conducted by Judge Honeywell, on April 19, 2016, this exact controversy was previewed in colloquy, as follows:

> Mr. Morello: Mr. Anthony was raising the confidentiality hearing scheduled for Tuesday. What I'm hearing is more of a confidentiality issue rather than IT forensic issue. So I'm not quite sure how it is relevant. The one thing I did want to raise, to the extent it goes to the confidentiality, there has been a ruling by the Court that the only exhibits that he has already filed in the public docket attached to their amended complaint to their TRO motion. So I'm not sure we will be encountering any of these confidential problems because there are not going to be exhibits allowed to be introduced that have not been already filed in the public docket.
> Pre-Trial Conference Hrg. Tr. 20:7-19.
> …
> Mr. Anthony: I do want your Honor, because Mr. Morello raised a totally different issue, and it is an important issue, and it relates to your Honor's two orders that were entered previously, each of the orders related specifically to a continuance that was requested, and also, to discovery issues and use of exhibits at trial. I'm very aware of what your Honor ordered in Dockets 64 and 75.
> Pre-Trial Conference Hrg. Tr. 22:3-9.
> …
> Mr. Anthony: I think it would be fair to opposing counsel for me to just note that the way I read your Honor's rulings, I don't see them as precluding us from using, in the ordinary course, the way we would under any other circumstances, Federal Rule of Evidence 612 and 613, and I recognize that the local rule that your Honor was applying 4.06, is explained by local Rule 1.01(b), the idea being that the local rules are not to be read so as to cause a conflict with respect to the Federal Rules of Evidence.
> Pre-Trial Conference Hrg. Tr. 23:21-25; 24:1-4.
> …
> Mr. Anthony: Rule 4.06 in your Honor's order says that the exhibits that we rely upon, and I think that's the operative provision, have got to be provided and they were. And then, in the time -- in the three months that have elapsed since that motion was filed, we filed the amended complaint, and we conducted our own internal discovery. We could have, following either one of those orders, sought to dismiss the

7

> motion and re-file it with everything. We didn't do that. We thought the most prudent way procedurally was to go with what was in the amended complaint. That still gave the Defendant, you know, 15 days each time, or more, to respond. But what we are concerned about is that, you know -- I'll save my argument for the Court if your Honor is indicating that the Magistrate can be free to rule on rebuttal exhibits.
>
> **The Court: The Magistrate is free to rule as the presiding Judge as she deems appropriate.**
>
> Pre-Trial Conference Hrg. Tr. 25:2-18.

[emphasis supplied]. Accordingly, this Court is free to permit application of applicable Federal Rules of Civil Procedure notwithstanding protestations by counsel for the Defendants that this is inconsistent with Local Rule 4.06 or the Exhibit Orders.

13. Significantly, the Court expressly contemplated in her remarks that a determination as to the applicability of Federal Rule of Evidence 612 and 613 was to fall within the provenance of the trial judge, as follows:

> Mr. Anthony: Well, your Honor, given we have case management today and a hearing on Tuesday, it may be that it's appropriate to raise these with the Magistrate.
>
> The Court: Perhaps. Because I'm not hearing the matter on Tuesday, and the purpose of my hearing today is to address the preliminary pretrial conference and to address Rule 16 issues, not to talk about the evidence that's going to be produced at the hearing next week before the Magistrate Judge."
> …
>
> The Court: Now, to the extent you have other requests regarding the hearing next week, they can be made to the Magistrate Judge who's going to be handling that hearing.
> …
> **The Court: The Middle District has set specific rules that govern the conduct of the preliminary injunction hearings. Obviously the Court can depart from those rules if the Court believes there's a reason to do so. We don't need to bring it to my attention because, again, I'm not handling the hearing. The Magistrate Judge is. So you can save your argument for the Magistrate Judge.**

Pre-Trial Conference Hrg. Tr. 23:2-10, 23:18-20; 24:18-24.

[emphasis supplied]. Based upon the above-cited remarks from the bench during the pretrial conference, Centennial contends that nothing about the Exhibit Orders preempts or limits the

8

discretion of this Court to permit impeachment utilizing the Proffered Exhibits, provided that they are not relied upon by Centennial for anything other than neutralizing inappropriate testimony by Bryant.

### B. OVERVIEW AND DISCLOSURE OF PROFFERED EXHIBITS

14. The Proffered Exhibits include the following documents that Centennial may wish to utilize to refresh Bryant's recollection or to impeach him, assuming that he does not simply examine these exhibits as attachments to this motion in advance of his testimony as opposing counsel has hoped to do in recent days:

   a. **Exhibit "G-1"**: Bryant's resume boasting the record amount paid by Centennial for Bay Cities, should he deny that this was a record amount based upon a going concern composed primarily of deposit accounts, loans, and other bank holdings.

   b. **Exhibit "G-2"**: E-mail transmission dated June 11, 2015, showing that Bryant was well aware that he was obligation under his Bay Cities non-compete agreement with a 75-mile radius for twelve (12) months during the week before he and his lawyers negotiated the Centennial non-compete agreement, should he deny that he had a clear opportunity to attempt to negotiate a cancellation of the broader Bay Cities non-compete but did not.

   c. **Exhibit "G-3"**: Bryant's e-mail blast of June 18, 2015, confirming his intent to remain with Centennial, together with the rest of the Bryant Team, following the acquisition, should he deny that he made numerous representations of this kind to Centennial and others right up until the time he received his $2,100,000 golden parachute.

   d. **Exhibit "G-4"**: Bryant's declaration in opposition to injunctive relief, making a number of statements under oath, that is a matter of record.

   e. **Exhibit "G-5"**: Bryant's staffing model showing his plans to terminate numerous positions at Bay Cities in order to justify the purchase price of any

9

bidder and fund golden parachutes for himself and his teammates, should he deny the fact that he was the architect of the terminations he complains about in paragraphs 7 through 17 of his declaration.

f. **Exhibit "G-6":** Another staffing model showing a number of staff in the operations department prior to the announcement date that Bryant earmarked for termination, should he attribute terminations to Birch or Centennial while being directly examined.

g. **Exhibit "G-7"**: E-mail by Bryant to Centennial employees within his footprint on November 6, 2015, explaining that Centennial might be planning salary increases, should Bryant contend that the reason that he and others wanted to leave Centennial was because Centennial was a bad place to work, as opposed to because he was enticing them to leave.

h. **Exhibit "G-8"**: A set of redacted executive loan committee minutes relating to the gap period between the announcement date and the acquisition date, showing that Bryant and the rest of the Bryant Team were the primary individuals in charge of the lending function during the gap period, should Bryant attempt to blame Centennial or Birch for loss of business during the gap period.

i. **Exhibit "G-9"**: E-mail traffic from June 2, 2015, in which Bryant says "I also believe you all hear me loud and clear that [Centennial] was my least favorite as a potential employer, and as long as I felt we had a viable alternative that was just as good, I did not want to work for them... to borrow Jim Lynch's phrase, I am now 'putting [Centennial] back on the table' (they never knew they were off),…" should Bryant contend that he was honest with Centennial or Bay Cities when saying that he planned to stay on after Centennial paid the purchase price and he got his golden parachute.

j. **Exhibit "G-10"**: An anthology of bank clearing house documentation, checks, and related documents showing the migration of money from Centennial to ServisFirst since the Injunction Motion was filed, should Bryant say that the market area he governs is not competing with Centennial.

k. **Exhibit "G-11"**: E-mail transmissions between Bryant and Palmer Proctor of Fidelity attempting to set up a meeting on July 9, 2015, three (3) weeks after he locked Centennial into the acquisition, should he contend that he decided to leave Centennial in November 2015 when conversion did not occur as he hoped.

l. **Exhibit "G-12"**: E-mail dated Friday, June 17, 2015, to Mr. Murrin, stating "On Monday I will do battle for your future", a clear allusion to a meeting that Bryant and Ms. Davey had on Monday, June 20, 2015, with Fidelity, should Bryant deny that he personally urged Mr. Murrin to leave Centennial.

m. **Exhibit "G-13"**: E-mail dated July 20, 2015, back to Mr. Murrin, after the meeting referenced in the preceding exhibit, saying that he had a good meeting and confirming flight plans to Atlanta, Georgia to meet Fidelity, should Bryant contend that there was something else going on on July 20, 2015, that would explain the preceding exhibit.

n. **Exhibit "G-14"**: E-mail dated July 22, 2015, from Bryant to Palmer Proctor of Fidelity confirming meeting and flight arrangements for Ms. Davey and Mr. Murrin following the meeting on July 20, 2015, that was attended by Mr. Bryant and Ms. Davey, should Bryant deny that he was marketing the package deal to Fidelity and not even bothering to copy Mr. Murrin and Ms. Davey regarding the logistics of his interview plans.

o. **Exhibit "G-15"**: E-mail dated July 24, 2015, from Bryant to Ms. Davey and Mr. Murrin, confirming the flight arrangements he made for both of them and

including a set of interview questions for their potential new employer, should he deny that he was the architect for this plan at a point in time that Bay Cities was under contract to be sold to Centennial.

p. **Exhibit "G-16"**: E-mail traffic, employment questions, an agenda, and calendaring items confirming the interviews that Bryant set up for the Bryant Team in Atlanta with Fidelity on July 31, 2015, should he deny the systematic marketing of a team of Bay Cities employees while he had a fiduciary obligation to Bay Cities and Centennial.

q. **Exhibit "G-17"**: Bryant's meeting binder for the July 20, 2015 meeting that he brought Ms. Davey to, should he deny the proposition that he ironically pretended to be "playing by the rules" as to his non-compete obligations while actually publishing confidential information and literally marketing several of his existing employees to a competitor.

r. **Exhibit "G-18"**: E-mail dated July 14, 2015, from Bryant to Mr. Murrin, should Bryant deny that he expressly included Mr. Murrin in his planning regarding the Fidelity defection.

s. **Exhibit "G-19"**: E-mail between and Palmer Proctor of Fidelity, also involving a lawyer for Bay Cities at the time, memorializing the end of the marketing effort in light of Bryant's obligations to Bay Cities and Centennial, should Bryant deny the reason that his gambit to relocate to Fidelity failed.

t. **Exhibit "G-20"**: E-mail string dated August 26, 2015, with Bryant scheduling a meeting for himself and Ms. Davey with John Corbett of CenterState for purposes of interviewing, should he deny the same.

u. **Exhibit "G-21"**: E-mails between John Corbett of CenterState and Bryant relating to financial pro formas and recruitment of Tom Quale and Sean Powers,

12

      current employees of Centennial, should Bryant deny that he was actively recruiting employees and actively transmitting financial data belonging to Bay Cities over to CenterState.

v. **Exhibit "G-22"**: E-mail traffic between John Tranter of CenterState and Bryant confirming that CenterState was speaking with Jack Greeley its counsel and wanted to speak with Bryant who was dove hunting, should Bryant deny that his methods in dealing with CenterState were the exact same as they had been with Fidelity.

w. **Exhibit "G-23"**: E-mail traffic between Bryant, Mr. Corbett, and Mr. Tranter, with CenterState providing an employment agreement on December 18, 2015, effective November 1, 2016, predicated upon the Bryant Team staying unemployed for approximately eleven (11) months of their non-compete term, assuming immediate resignation, should Bryant deny that CenterState was willing to "play by the rules" regarding non-compete issues, and that is why Bryant did not want to work with them.

x. **Exhibit "G-24"**: Bryant's minimalist interrogatory responses served at 9:30 p.m. on April 25, 2016, should Bryant attempt to deny that during the entire period that Bay Cities was attempting to deal successfully with conversion, he was instead interviewing continuously with five (5) <u>additional</u> banks[8] for himself and his immediate senior management.

y. **Exhibit "G-25"**: E-mail traffic between Ms. Davey and Mr. Zunz involving a Centennial customer during January 2016 and efforts of Bryant's subordinates to relocate several credits from Centennial to ServisFirst, should Bryant deny that his proxies are competing with Centennial.

---

[8] Floridian Bank, TAB Bank, Atlas Bank, Apollo Bank, and Stonegate Bank.

13

z. **Exhibit "G-26"**: E-mail traffic between Bryant and other ServisFirst officers with respect to Sunshine Bank, located in Plant City, Hillsborough County, Florida, should Bryant deny that he is actively and directly competing with Centennial, even under the tortured contract analysis urged by his counsel in this controversy.

aa. **Exhibit "G-27"**: Credit request dated January 28, 2016, submitted by ServisFirst and relating directly to a then-existing client of Centennial who has migrated to ServisFirst since the Injunction Motion has been filed, should Bryant deny successful efforts to refinance a large credit based in St. Petersburg, Florida.

bb. **Exhibit "G-28"**: Two (2) checks confirming migration of credits for an Indian Rocks Beach customer of Centennial, dated March 8, 2016, should Bryant deny that the competition continues even following the filing of pleadings by the Defendants saying they have no intention of competing with Centennial in the market area.

cc. **Exhibit "G-29"**: E-mail confirmations of Bryant sending Centennial employee Ms. Davey her resume on December 9, 2015, and sending Centennial employee Alma Bizares her resume on December 24, 2015, leading an ordinary person to conclude that Bryant was rewriting resumes for bank officers identified on his staffing models, should he deny that he was attempting at the time to orchestrate a mass migration from Centennial.

dd. **Exhibit "G-30"**: Bryant's e-mail traffic confirming his transmission of items to be disclosed, from Bryant to ServisFirst's Mr. Broughton, on Friday, October 23, 2015, the same having been received by Mr. Broughton at 9:29 a.m. on October 28, 2015, should Bryant deny the delivery.

ee. **Exhibit "G-31"**:   E-mail transmission with commitment terms from Bryant individually (as principal of a private lender, Catapult Funding, LLC), providing for a questionable and undisclosed loan to a borrower (also borrowing from Bay Cities/Centennial) who is the subject of another motion pending before this Court, should Bryant deny that he was actually violating Regulation O disclosures to Bay Cities, the ethics codes of two (2) financial institutions and a range of other obligations, by obtaining an undisclosed equity interest in a borrower both of him individually and of the financial institution he controlled.[9]

ff. **Exhibit "G-32"**:   Commitment letter dated January 22, 2015, relating to the insider loan referenced above, should Bryant deny that it was made.

gg. **Exhibit "G-33"**:   Future advance document under which Bryant lent an additional $150,000 to the same Bay Cities borrower, in connection with an arrangement that also augmented Bryant's consulting agreement with that borrower to $155,000 from the original $125,000, should he deny the additional extension of credit and the additional consideration being received under the aforementioned consulting agreement.

hh. **Exhibit "G-34"**: Executive loan committee minutes for August 20 and August 27, 2015, in which Bryant presides over a meeting during the gap period where he sought and obtained approval for a $12.7MM loan to the same borrower who is the subject of the preceding exhibits, while at no time explaining to the Committee his own conflict of interest, should he contend that he obeys banking laws.

---

[9] "Centennial's Motion to Compel Complete Responses to Subpoenas to Produce Documents Served on Catapult Entities and Incorporated Memorandum of Law" [Doc. No. 87], filed on April 20, 2016.

15

    ii. **Exhibit "G-35"**: Bay Cities' disclosures under Regulation O, reflecting that Bryant never disclosed any business relations to any corporation other than Bay Cities, including the Catapult Funding, LLC as the subject of the preceding Proffer Exhibits, should Bryant deny that he concealed information form Bay Cities in a manner consistent with his other comparable breaches of his non-compete agreement with Bay Cities and with Centennial.

    jj. **Exhibit "G-36"**: Objectives document showing Bryant's strategy for leaving Bay Cities/Centennial as ultimately implemented by the Bryant Team, should he contend that the entire defection was spontaneous and unrehearsed.

This motion is being filed immediately upon completion with the understanding that unredacted exhibits will be served by e-mail as soon as clerically possible and filed with the Court as well in redacted form.

### C. MEMORANDUM OF LAW

15. The whole manner of dealing with this sort of issue has been articulated in <u>Pure Power Boot Camp v. Warrior Fitness Boot Camp</u> 587 F. Supp.2d 548 (S.D. NY 2008). In <u>Pure Power</u>, a former employer seeking injunctive relief against a dishonest former employee who had migrated to a competitor was found to have violated criminal provisions of the Stored Communications Act by hacking into e-mails and obtaining e-mails confirming the former employer's entitlement to the relief requested as a former employee. After determining that the e-mails were criminally obtained, and therefore could not be introduced to establish the former employer's entitlement to injunctive relief, United States Magistrate Judge Theodore H. Katz determined that the e-mails, regardless of their origin, and the circumstances under which they were criminally obtained, nevertheless concluded that the e-mails could in fact be utilized for purposes of impeachment of the former employee regarding clear plans to breach obligations to the former employer. The relevant analysis is as follows:

16

> In the end, the one thing that should remain unsullied is the integrity of the judicial process. In this Court's view, that integrity is threatened by admitting evidence wrongfully, if not unlawfully, secured. Therefore, in light of the unique circumstances of this case, the Court recommends that the e-mails be precluded from use in the litigation, but not for impeachment purposes should Defendants open the door. The Court also recommends that Plaintiffs should return or destroy all copies of E-mail 28, and so certify.

Id. at 571 (citations omitted). Accordingly, even though there was no doubt that the documents at issue were obtained as a result of criminal activity of the movant, the overriding need for the integrity of the judicial process dictated that the e-mails be admitted.

16. By comparison with the facts of Pure Power, all the materials included among the Proffered Exhibits are documents either obtained by subpoena from Fidelity or CenterState, received of record during this cause from the Defendants, or obtained by Birch during his investigation of systems maintained by Bay Cities and then by Centennial as its successor.[10] It is significant that in the matter at bar, there is no substantive policy that would preclude introduction of the Proffered Exhibits because they were properly obtained, not inappropriately obtained, and Bryant has had every motivation to share his past work with his current employer and counsel. Only Local Rule 4.06 has any bearing on the analysis, the Court having been clear at the pretrial conference that this Court has discretion with respect to this controversy. Moreover, it is clear that Federal Rule of Civil Procedure 65 is in no way to be read to preclude impeachment exhibits at an injunction hearing, and does not itself require that all documents relied upon be attached to such a motion.

17. It is noted that Local Rule 1.01(b) provides as follows:

> These rules are intended to supplement and complement the Federal Rules of Civil Procedure, the Federal Rules of Criminal Procedure, and other controlling statutes and rules of Court. They shall be applied, construed and enforced to avoid inconsistency with other governing statutes and rules of court, and shall be employed to provide fairness and simplicity in procedure, to avoid technical and unjustified delay, and to secure just, expeditious and inexpensive determination of all proceedings.

---

[10] Centennial parenthetically attaches as Composite Exhibit "H" documentation reflecting that the Bryant Team, in addition to having an affirmative duty to disclose most of the material at issue, had no right to privacy with respect to the fraudulent scheme that Bryant orchestrated.

17

Accordingly, there is nothing about Local Rule 4.06 that should eviscerate Centennial's rights to utilize Bryant's own materials to cross-examine him, or refresh his recollection, should this be appropriate under the provisions of Federal Rules of Evidence 612 and 613.

18.     As directed, Centennial is making full disclosure of all documentation it believes is potentially necessary in light of the subject matter of the hearing and the amount of time allotted. It should not be overlooked that by filing this motion Centennial has now alerted Bryant as to areas of impeachment so that Bryant can fix his testimony in advance. Accordingly, not only are the Defendants not prejudiced, but they have received a unique benefit not afforded under the Federal Rules of Evidence, simply because Centennial is required to give up these potential exhibits in hopes of proving its case for prompt injunctive relief.

19.     In the event that this Court were for any reason inclined to disallow any of the Proffered Exhibits, Federal Rule of Evidence 103(a)(2) is applicable with respect to proffer of excluded exhibits among the Proffered Exhibits:

> **(a) Preserving a Claim of Error**. A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party, and:
> …
> (2) if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context.

Accordingly, especially given the frequency of objections and other interruptions regarding examination and exhibits during the first day of hearing, it is particularly helpful in the opinion of Centennial that all of the Proffered Exhibits be provided via this motion, so that they can be deemed a proffer to the extent that impeachment or refreshment of recollection is not permitted, and an appropriate record may be made.

### D.     LOCAL RULE 3.01(g) CERTIFICATION

The undersigned hereby certifies that counsel for Centennial has conferred extensively with the Defendants' counsel in a good faith effort to resolve the issues raised by this motion, with a

continuum of telephone calls, e-mails, and colloquy referenced above, including most recently a conference call that occurred at approximately 9:00 a.m. on April 27, 2016. The Defendants continue to cling to the proposition that the Exhibit Orders are intended to preclude Centennial from effectively cross-examining Bryant.

WHEREFORE, Centennial respectfully requests that this Court enter an order that will:

a. permit Centennial to utilize applicable Proffered Exhibits to the extent necessary to impeach or refresh the recollection of Bryant;

b. accept this filing as proffer of the Proffered Exhibits for purposes of addressing the record in this cause; and

c. apply the applicable Local Rules in a manner consistent with the entitlements of the parties under the Federal Rules of Evidence, and Federal Rule of Civil Procedure 65.

/s/ John A. Anthony
**JOHN A. ANTHONY, ESQ.**
Florida Bar Number: 0731013
janthony@anthonyandpartners.com
**ALLISON C. DOUCETTE, ESQ.**
Florida Bar Number: 0085577
adoucette@anthonyandpartners.com
**ANDREW J. GHEKAS, ESQ.**
Florida Bar Number: 119169
aghekas@anthonyandpartners.com
Anthony & Partners, LLC
201 North Franklin Street, Suite 2800
Tampa, Florida 33602
Telephone: (813) 273-5616
Telecopier: (813) 221-4113
Attorneys for Centennial

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via electronic means on this 27th day of April, 2016, to the following:

Sean P. Keefe, Esq.
James Hoyer, P.A.
One Urban Centre, Suite 550
4830 W. Kennedy Blvd.
Tampa, FL 33609
skeefe@jameshoyer.com

Burt W. Wiand, Esq.
Gianluca Morello, Esq.
Wiand Guerra King PL
Wiand Guerra King P.A
5505 W Gray St
Tampa, FL 33609-1007
bwiand@wiandlaw.com
gmorello@wiandlaw.com

Michael T. Sansbury, Esq.
Spotswood Sansom & Sansbury
1819 Fifth Avenue North
Suite 1050
Birmingham, AL 35203
msansbury@spotswoodllc.com

/s/ John A. Anthony
**ATTORNEY**