# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

CENTENNIAL BANK,

     Plaintiff,

v.                                Case No: 8:16-cv-88-CEH-CPT

SERVISFIRST BANK INC.,
GREGORY W. BRYANT, GWYNN
DAVEY, PATRICK MURRIN and
JONATHAN ZUNZ,

     Defendants.

_____/

## ORDER

This matter comes before the Court on Third-Party/Counter-Defendant John W. Allison's Dispositive Motion for Final Summary Judgment [Doc. 450] in which Plaintiff/Counter-Defendant Centennial Bank joined [Doc. 541], Gregory W. Bryant's Opposition [Doc. 492], John W. Allison's Reply [Doc. 511], and the Joint Statement of Agreed Material Facts [Doc. 501]. In his motion, Mr. Allison presents several arguments as to why the Court should enter judgment as a matter of law on Mr. Bryant's counterclaim against him for defamation. The Court heard arguments on November 13, 2020 [Doc. 744].   Having reviewed the evidence presented and considered the arguments of counsel, the Court will **GRANT** Third-Party/Counter-Defendant John W. Allison's and Plaintiff/Counter-Defendant Centennial Bank's Dispositive Motion for Final Summary Judgment.

1

## I.   BACKGROUND AND FACTS[1]

*Undisputed Material Facts*

On June 17, 2015, Home BancShares, Inc. and its wholly-owned entity Centennial Bank entered into an Agreement and Plan of Merger with Florida Business BancGroup, Inc. and its wholly-owned entity Bay Cities Bank. [Doc. 501 ¶ ¶ 2, 14]. At the time, Mr. Bryant served as the President/CEO of Bay Cities. [Doc. 263 at p. 61 ¶ 7, Doc. 37 ¶ 3]. By an agreement bearing the same date, Mr. Bryant also agreed to employment with Centennial. [Doc. 199-2 at pp. 69-76]. A press release was issued that same day and news of the merger was published by the Tampa Bay Business Journal ("the Journal"). [Doc. 450-11; Doc. 450-7 at pp. 25-34]. On October 1, 2015, Centennial acquired Bay Cities. [Doc. 391 ¶ 8].

On December 31, 2015, Mr. Bryant emailed his letter of resignation as Regional President for the Tampa Bay region to Centennial's President and CEO, Tracy French. [Doc. 501 ¶ 21; Doc. 450-2 at p. 57]. Mr. Bryant also emailed resignation letters from Patrick J. Murrin who served as Chief Lending Officer for the Tampa Bay Division; Gwynn Davey who served as Market President for Hillsborough County; and Jonathan Zunz who served as a Commercial Loan Officer II. [Doc. 501 ¶ 21; Doc. 38 ¶ 3; Doc. 450-a at p. 74; Doc. 40 ¶ 3]. On January 4, 2016, the Journal ran a story that

---

[1] The Court has determined the facts, which are undisputed unless otherwise noted, based on the parties' submissions, including affidavits/declarations, depositions, responses to requests for admission, and the Joint Statement of Agreed Material Facts.

"[t]wo months after Centennial Bank bought Bay Cities Bank, the former president and CEO of Bay Cities has left." [Doc. 450-7 at p. 53].

Centennial's founder and chairman John Allison found out "fairly quickly" that Bryant and the others might have been leaving for ServisFirst Bank and made a call about this to ServisFirst's CEO Thomas Broughton "pretty early in January." [Doc. 450-2 at p. 44: l. 6 – p. 45: l. 15]. The two "were friends." *Id.* at p. 38: l. 11-12; Doc. 450-4 at pp. 14, Tr. 228: l. 1 -12. During the call, Mr. Allison asked Mr. Broughton if he had hired Mr. Bryant and why he had done so. [Doc. 450-2 at p. 38: l. 1 – l. 10; 450-4 at p. 14, Tr. 22: l. 12 – l. 23]. Mr. Allison also stated that he would have eventually fired Mr. Bryant because Tampa Bay was Centennial's worst performing region. [Doc. 35-1; Doc. 450-2 at p. 38: l. 13 –1.14; Doc. 450-4 at p. 14, Tr. 228: l. 11 –l. 15].

Shortly after, Mr. Bryant, Mr. Davey, and Mr. Murrin were each sent copies of their agreements with Centennial, reminded of their non-compete and non-solicitation obligations, and admonished not to breach the non-solicitation and non-compete provisions. [Doc. 501 ¶ 22]. Mr. Zunz and Mr. Broughton were also advised to refrain from any acts which would violate the obligations of the non-compete or non-solicitation provisions in Mr. Bryant's, Mr. Davey's, or Mr. Murrin's agreements with Centennial. *Id.* ¶¶ 23, 24. On January 14, 2016, Centennial filed suit against ServisFirst and Mr. Bryant, alleging among other things that its former employees had engaged in a pattern of actionable misconduct by leaving their senior positions in an orchestrated manner in order to directly compete with Centennial as new employees

of ServisFirst. [Doc. 1 ¶ 7]. The Journal ran a news story about the lawsuit that same day. [Doc. 4507 at pp. 59-60]. The following day Centennial moved for an order temporarily and permanently enjoining ServisFirst, Mr. Bryant, Mr. Davey, Mr. Murrin, and Mr. Zunz from engaging in their "actionable misconduct" pending the Court's adjudication of the claims asserted in the complaint. [Doc. 4 at p. 1]. The Journal also published a story about "the newest bank in Tampa Bay," ServisFirst. [Doc. 450-7 at p. 62]. The story was accompanied by a picture of Mr. Bryant, who was identified as "former president and CEO of Bay Cities Bank and former Tampa division president – briefly – for Centennial Bank after Centennial bought Bay Cities."[2] *Id.*

On January 21, 2016, Home Bancshares had a scheduled earnings call with investors to discuss its fourth quarter 2015 performance. [Doc. 501 ¶ 25]. During that meeting, Mr. Allison made the following statement:

> Asset quality remained good except for, as always, when we buy new a new bank. We bought Tampa, and we've got to go in and clean that up - clean that mess up as always. We've got about $23 million worth of non- performing and past due loans are about 5% and it really was the only one that ticked up, but it pulled our totals up just a little bit, but we'll get through that before too long as we always do. $23 million is something that we can deal with. The good news is the CEO and the CLO are no longer with us.

---

[2] The Journal had previously reported on January 11, 2016, that Mr. Bryant had joined ServisFirst and had set up a loan production office in Lutz, Paso County—because of his one-year employment agreement with Centennial—and hoped to have branches in Hillsborough County upon expiration of his noncompete restrictions. [[450-7 at p. 57].

*Id.* Details of the call were published by the Journal on January 26, 2016, in a story titled "ServisFirst celebrates, Centennial bashes well-known Tampa banker." [Doc. 450-7 at pp. 64-65].

*Procedural history*

On November 14, 2016, Centennial filed a second amended complaint adding Ms. Davey, Mr. Murrin, and Mr. Zunz as defendants. [Doc. 199]. Mr. Bryant answered that complaint on November 29, 2017 and filed a counterclaim against Centennial and Mr. Allision for defamation. [Doc. 263 at pp. 61-65]. The counterclaim specifically identified Mr. Allision's statements to Mr. Broughton during the January 7, 2016, telephone call and his statements during the corporate earnings call on January 21, 2016 and alleged that these statements—made on Centennial's behalf— damaged him. *Id.* ¶¶ 14, 15, 22. Additionally, Mr. Bryant alleged that these statements may have been knowingly and deliberately false based on verified allegations in the amended complaint that he was a talented banker who built Bay Cities Bank into a "robust" institution for which Centennial agreed to pay a record amount of money. *Id.* ¶¶ 17-21.

After months of discovery and motion practice, Mr. Allison moved for summary judgment on the counterclaim for defamation. [Doc. 450]. First, Mr. Allison contends that because Mr. Bryant is a "public figure" he must show that the statements were made with actual malice and he cannot do so. *Id.* at pp. 29-37. In fact, Mr. Allison posits that the statements are not actionable because they constitute rhetorical hyperbole or opinion. *Id.* at pp. 33-36. Mr. Allison further contends that summary

judgment is warranted even if the Court determines that Mr. Bryant is not a public figure as there is no evidence that he was negligent in making his statements about Bryant; he relied on information provided to him by reliable sources. *Id.* at pp. 37-38. Moreover, Mr. Allision contends that Mr. Bryant has no evidence of injury, as he suffered no demotion, loss of pay or loss of authority, and was promoted at ServisFirst Bank. *Id.* at p. 38. Mr. Allison further argues that a qualified privilege, under common law, extends to his speech and the showing of express malice required to overcome this privilege has not been shown. *Id.* at pp. 39-41. Mr. Allison also argues that dismissal is required pursuant to Florida Statutes § 770.01 because Mr. Bryant did not provide him with notice five days prior to filing suit of the specific words alleged to be false and defamatory as the statute requires. *Id.* at pp. 41-42. Lastly, he argues that summary judgment is required on the punitive damage claim as both constitutional actual malice and common law express malice are required to sustain any recovery of punitive damages in a defamation action and Mr. Bryant can show neither. *Id.* at p 42.

In his response, Mr. Bryant has called into question the contradiction between Mr. Allison's two statements and the allegations in the Verified Amended Complaint "which depicted [Mr.] Bryant as a talented banker whose departure crippled Centennial and destroyed the purpose of the Bay Cities acquisition." [Doc. 492 at pp. 6-7. First, he argues that he is neither a public figure for all purpose nor for a limited purpose, such that he is only required to establish that Mr. Allison was negligent in making the statements at issue. *Id.* at pp. 7-13. But, he contends that genuine issues of fact preclude summary judgment on the issue of Mr. Allison's negligence. *Id.* at pp.

18. On the one hand, he explains that Mr. Allison purports to have evidence that in making the statements he relied on information provided to him by Kevin Hester, the bank's chief lending officer. *Id.* On the other hand, he states that if it turns out that Mr. Hester's information was false, Mr. Allison would have jumped the gun in making his statements and would have been at least negligent. *Id.* At the same time, he contends that even though proof of actual malice isn't required, there are contradictions between Mr. Allison's statements and the allegations in the complaint and interrogatory responses, which entwine his counterclaim with Centennial's claims, and are sufficient to defeat summary judgment. *Id.* at pp. 13-17. Mr. Bryant further contends that the common law privilege does not apply and that the protections afforded by the Florida Statutes only extend to members of the media. *Id.* at pp. 19-21.

Mr. Allison filed a reply, explaining that all the material facts are not in dispute, and again defending each of his grounds for summary judgment. [Doc. 511]. There, he described Mr. Bryant as "a civic leader in Tampa Bay . . . for more than 30 years" who "reigned over an institution that provided extensive financing to businesses large and small, amassing for itself assets of more than $500 million;" "regularly accessed the media;" and "used his post to become a statewide figure, playing a prominent role in influencing state and federal legislative and regulatory decisions," which rendered him a pervasive public figure in his community. *Id.* at pp. 10-11. According to Mr. Allison, Mr. Bryant also meets the requirements to qualify as a limited purpose public figure or a vortex public figure at the center of a public controversy. *Id.* at p. 11-12. Among other things, Mr. Allison argues that Mr. Bryant cannot make the threshold

showing that the statements were substantially false, and that Mr. Allison made the statements with actual malice. *Id.* at pp. 13-16.

## II.   LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Issues of fact are "genuine only if a reasonable jury, considering the evidence present, could find for the nonmoving party," and a fact is "material" if it may affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986). In determining whether a genuine issue of material fact exists, the court must consider all the evidence in the light most favorable to the nonmoving party. *Celotex*, 477 U.S. at 323.

The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex*, 477 U.S. at 323; *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004).  That burden can be discharged if the moving party can show the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325. When the moving party has discharged its burden, the nonmoving party must then designate specific facts showing that there is a genuine issue of material fact. *Id.* at 324. However, a party cannot defeat summary judgment

by relying upon conclusory allegations. *See Hill v. Oil Dri Corp. of Ga.*, 198 F. App'x 852, 858 (11th Cir. 2006). Likewise, "[a] 'mere existence of a scintilla of evidence' cannot suffice to create a genuine issue of material fact." *Johnson v. New Destiny Christian Ctr. Church, Inc.*, No. 19-11070, 2020 WL 5289881, at *3 (11th Cir. Sept. 4, 2020) (quoting *Anderson*, 477 U.S. at 252).

## III.   DISCUSSION

Under Florida law, defamation has these five elements: "(1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." *Turner v. Wells*, 879 F.3d 1254, 1262 (11th Cir. 2018) (citing *Jews For Jesus, Inc. v. Rapp*, 997 So.2d 1098, 1106 (Fla. 2008)). Mr. Bryant has raised issues as to the falsity of the statements, the presence of malice or negligence, as well as the existence of an injury. [Doc. 450 at pp. 26-38].

### a.  *Falsity*

"A false statement of fact is the sine qua non for recovery in a defamation action." *Hallmark Builders, Inc. v. Gaylord Broad. Co.*, 733 F.2d 1461, 1464 (11th Cir. 1984) (citing *Byrd v. Hustler Magazine, Inc.*, 433 So.2d 593, 595 (Fla.App.1983)); *see also Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305, 1308 (11th Cir. 2001) ("[A] statement must be false to be libelous."). Without falsity, a claim for defamation cannot lie. For example, in *Dunn v. Air Line Pilots Ass'n*, 193 F.3d 1185, 1188 (11th Cir.

9

1999), the appellate court held that that the district court for the Southern District of Florida had correctly granted summary judgment against the pilots on their libel claims—against the Air Line Pilots Association—for failure to show falsity in listing them as "scabs." In so holding, the court reasoned that considering the undisputed facts, a reasonable reader of defendant's list of "The Scabs of Eastern of the Strike of '89" would interpret it as a list of those pilots who crossed the union's picket lines and worked during the 1989 work stoppage, and because the pilots admitted that they had crossed picket lines to work during that 1989 work stoppage, defendant's listing of them as "scabs" was factually true. *Id.* at 1194.

Addressing this element of defamation, the Eleventh Circuit recently stated:

> True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment. *Keller v. Miami Herald Publ'g Co.*, 778 F.2d 711, 714–15, 717 (11th Cir. 1985) (applying Florida law); *Blake v. Giustibelli*, 182 So.3d 881, 884 n.1 (Fla. Dist. Ct. App. 2016) ("Statements of pure opinion are not actionable."); *Anson v. Paxson Commc'ns Corp.*, 736 So.2d 1209, 1211 (Fla. Dist. Ct. App. 1999); *Miami Child's World, Inc. v. Sunbeam Television Corp.*, 669 So.2d 336, 336 (Fla. Dist. Ct. App. 1996).
>
> Under Florida law, a defendant publishes a "pure opinion" when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public. *From v. Tallahassee Democrat, Inc.*, 400 So.2d 52, 57 (Fla. Dist. Ct. App. 1981). Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the publication or assumed to exist by the parties to the

communication. *Id.*; *Stembridge v. Mintz*, 652 So.2d 444, 446 (Fla. Dist. Ct. App. 1995).

Whether the statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court. *Keller*, 778 F.2d at 715; *Fortson v. Colangelo*, 434 F.Supp.2d 1369, 1379 (S.D. Fla. 2006); *From*, 400 So.2d at 56-57. When making this assessment, a court should construe statements in their totality, with attention given to any cautionary terms used by the publisher in qualifying the statement. *Keller*, 778 F.2d at 717. It is also the court's function to determine "whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct." *Stembridge*, 652 So.2d at 446 (quoting Restatement (Second) of Torts § 566, comment c).

*Turner*, 879 F.3d at 1262-63. *See Hamze v. Cummings*, 652 F. App'x 876, 881 (11th Cir. 2016) ("Jenne's June 2007 statements to the media are not actionable because they were either statements of opinion or true statements. Jenne's expression of his opinion that Hamze's crime was 'a brutal, senseless, roadrage killing' that showed a 'disregard for human life[]' . . . cannot support a claim for defamation. And, as alleged in the complaint, Jenne's statement that he intended to charge Hamze with first degree murder was substantially true."). "[A] speaker cannot invoke a 'pure opinion' defense, [however,] if the facts underlying the opinion are false or inaccurately presented." *Deeb v. Saati*, 778 F. App'x 683, 687–88 (11th Cir. 2019).

To illustrate what qualifies as a pure opinion, the Supreme Court in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18-19 (1990), explained that the statement, "In my opinion Mayor Jones is a liar" would be actionable because the speaker "implies a

knowledge of facts which lead to the conclusion that Jones told an untruth." However, the Court noted that the statement " 'In my opinion Mayor Jones shows his abysmal ignorance by accepting the teachings of Marx and Lenin,' would not be actionable." *Id.* at 20. The Court reasoned that "a statement of opinion relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." *Id.* (with reference to *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767 (1986)).

In *Turner*, the Eleventh Circuit considered several statements made in an investigative report prepared by a law firm hired to investigate allegations of bullying within the Miami Dolphins professional football organization. 879 F.3d at 1259, 1263. One of the statements was that on at least one occasion plaintiff had participated in "homophobic taunting" of a particular player. Id. at 1264. The court found that the statement was an opinion as it was the defendants' subjective assessment of the plaintiff's conduct—as outlined in the investigative report—and was not readily capable of being proven true or false. *Id.* The court also found that statements in the report that plaintiff "should have realized that it was inappropriate to send [certain] text messages to an emotionally troubled player" and that this "demonstrated poor judgment on [plaintiff's] part" were also not actionable as they were pure opinions. *Id.* at 1266. See also *Keller,* 778 F.2d at 717-718 (holding that a newspaper cartoon's suggestion that plaintiff acted objectionably by taking advantage of patients at Krestview Nursing Home constituted a statement of pure opinion as "[t]he facts upon which the statement was based were contained in the cartoon: the condition of the

nursing home and the large amount of money the 'Boss' had made" and "the facts . . . had been well publicized so that . . . readers were aware of the series of events upon which the cartoonist based his opinion.").

The Court agrees with Mr. Allison that his statement to Mr. Broughton, that he would have fired Mr. Bryant eventually because Tampa Bay was Centennial's worst performing region is a statement of pure opinion. Again, "[a] 'pure opinion' is 'a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public.' ". *Deeb*, 778 F. App'x at 687 (quoting *Turner*, 879 F.3d at 1262). The comment that Mr. Bryant would have been fired eventually is based on facts presented in the statement that Tampa Bay had the worst performance. The statement did not leave anything to implication. *Milkovich*, 497 U.S. at 18-19. Mr. Bryant has presented no evidence that the facts underlying the opinion are false or inaccurately presented.[3] Therefore, as a matter of law, a claim cannot lie as to Mr. Allison's statement to Mr. Broughton. "[S]tatements of pure opinion are protected from defamation actions by the First Amendment." *Turner,* 879 F.3d at 1262 (citing *Keller*, 778 F.2d at 714–15, 717).

Likewise, Mr. Allison's statement, during the corporate earnings call, that Mr. Bryant's departure from Centennial is "good news" and that Centennial had to clean up a mess when it acquired Bay Cities, including $23 million in non-performing loans

---

[3] In fact, as Mr. Allison notes in the reply, Mr. Bryant does not contest that Tampa was Centennial's worst performing bank or that Mr. Allison would have fired him. [Doc. 511 at p. 16].

and past due loans of 5 percent,[4] also constitutes pure opinion. This is because the opinion that it was "good news" that Mr. Bryant was no longer with Centennial was accompanied by the factual statements as to the value of non-performing loans and percentage of past due loans acquired following the merger. Mr. Allision provided a factual reason for his opinion and there is no implication that there are any undisclosed facts, which serve as the basis for that opinion. As is the case with the other statement, Mr. Bryant does not claim that the facts underlying the opinion are false or inaccurately presented.[5] Hence, judgment as a matter of law is warranted as to the lack of falsity of these statements. Because Mr. Bryant cannot establish falsity, the Court need not consider the remaining elements of defamation and the counterclaim fails as a matter of law.  However, the Court will consider the issue of Mr. Bryant's status as a public figure.

### b.  Malice regarding a public figure

The absence of malice provides another independent basis for summary judgment in this case. It has long been established that "[i]f the injured party is a public figure or official and the defamatory material involves issues of legitimate public concern, the

---

[4] In contending that Mr. Bryant has sued on three statements, Mr. Allison presents these allegations as two defamatory statements. [Doc. 450 at p. 27, Doc. 511 at p. 15]. However, the Court construes these allegations, both raised in the same paragraph of the counterclaim, as one defamatory statement. *See generally Mahoney v. Owens*, 818 F. App'x 894, 898 (11th Cir. 2020) ("[I]n making the necessary preliminary determination of *what claims the plaintiff has actually raised* ... we are bound by the contents of the plaintiff's pleadings, even on summary judgment.") (quoting *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 976 (11th Cir. 2005)).

[5] Mr. Allison points out that Mr. Bryant does not contest the assertion that he left Centennial holding $23 million in non-performing or past due loans. *Id.*

plaintiff must prove that the defendant acted with actual malice to establish liability."[6]
*Silvester v. Am. Broad. Companies, Inc.*, 839 F.2d 1491, 1493 (11th Cir. 1988) (collecting

cases). Proof of actual malice is required in such situations "[b]ecause of the expressive

freedom guaranteed by the First Amendment." *Berisha v. Lawson*, 973 F.3d 1304, 1310

(11th Cir. 2020). To show actual malice, a plaintiff must show that the "defendant[]

published the defamatory material with a 'high degree of awareness of … [its] probable

falsity.' " *Id.* (quoting *Garrison v. Louisiana,* 379 U.S. 64, 74, 85 S.Ct. 209, 216, 13

L.Ed.2d 125 (1964)).

     i.   Mr. Bryant is a public figure

      "Determining whether an individual is a public figure—and thus subject to the

actual malice analysis—is a question of law for the court to decide*." Michel v. NYP

Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016). "An individual may qualify as a

public figure either generally—that is one with such fame and notoriety that he will be

a public figure in any case—or for only 'limited' purposes, where the individual has

thrust himself into a particular public controversy." *Berisha*, 973 F.3d at 1310

(citing *Turner v. Wells*, 879 F.3d 1254, 1272 (11th Cir. 2018)). "We apply a two-part

test to determine whether someone is a limited public figure: 'First, [we] must

determine whether the individual played a central role in the controversy. Second, [we]

---

[6] To the contrary, a private figure need only establish negligence to recover for defamation.
*Miami Herald Pub. Co. v. Ane*, 458 So. 2d 239, 242 (Fla. 1984); *Rubin v. U.S. News & World
Report, Inc.*, 271 F.3d 1305, 1306 (11th Cir. 2001) (stating same); *see also Straw v. Chase Revel,
Inc.*, 813 F.2d 356, 361–62 (11th Cir. 1987) ("[A]lthough a private figure can recover
compensatory damages upon a showing of simple fault or negligence, to recover punitive
damages the aggrieved party must meet the *New York Times* standard of actual malice.").

must determine whether the alleged defamation was germane to the individual's role in the controversy.' " *Id.* (quoting *Turner*, 879 F.3d at 1272); *see also Little v. Breland*, 93 F.3d 755, 757 (11th Cir. 1996) (stating that "to determine if the plaintiff is a limited purpose public figure . . . we must '(1) isolate the public controversy, (2) examine the plaintiff's involvement in the controversy, and (3) determine whether the alleged defamation [was] germane to the plaintiff's participation in the controversy' ") (quoting *Silvester v. Am. Broad. Cos.*, 839 F.2d 1491, 1494 (11th Cir. 1988)).

The Eleventh Circuit has explained that:

> Two "fundamental" criteria help draw the line between public and private figures: (1) "public figures usually have greater access to the media which gives them a more realistic opportunity to counteract false statements than private individuals normally enjoy"; and, more importantly, (2) public figures typically "voluntarily expose themselves to increased risk of injury from defamatory falsehoods."

*Id.* (quoting *Silvester*, 839 F.2d at 1494). "For the most part those who attain this status [of public figure] have assumed roles of especial prominence in the affairs of society." *Hutchinson v. Proxmire*, 443 U.S. 111, 134, 99 S. Ct. 2675, 2687–88, 61 L. Ed. 2d 411 (1979). They usually "invite attention and comment." *Id.* at 134.

The record before the Court shows that over the years—from as early as the year 2000—Mr. Bryant has been quoted and pictured in the Journal in relation to the affairs of Bay Cities during his time at the helm of that bank and in relation to the banking industry. [Doc. 450-6 at pp. 5, 8-9, 11-12, 13-14, 15-17, 18-19, 20-21, 29-30, 31-32, 33-35, 37, 39-41, 43-44, 46, 47-49, 50-51, 53-54, 79]. He was also featured in a

16

number of articles in that publication regarding Centennial's acquisition of Bay Cities. [Doc. 450-7 at pp. 25-26, 27, 28, 29, 32-33, 34, 42]. Shortly after he informed Centennial of his resignation, the Journal ran a story about it. *Id.* at pp. 53. The Journal also reported that he joined ServisFirst after he resigned, and that Centennial had filed a lawsuit against both Mr. Bryant and his new employer. *Id.* at pp. 57, 59-60, 62, 64-65.

The undisputed evidence easily qualifies Mr. Bryant as a public figure for the limited purpose of the banking profession and the merger between Centennial and Bay Cities under Mr. Bryant's leadership and Mr. Bryant's departure to ServisFirst shortly after. He is undoubtedly the central figure in the controversy, which according to the complaint is the "orchestrated relocation of Bryant, Murrin, Davey, and Zunz . . . from Centennial to ServisFirst, shortly after Centennial's acquisition of the Departed Officers' former employer, Bay Cities Bank." [Doc. 199 ¶ 10].

To determine whether the first part of the test is satisfied, the Court considered the press surrounding the sale of Bay Cities to Centennial. Forty-three banks were initially approached to buy Bay Cities and eight of those banks submitted initial bids. [Doc. 501 ¶¶ 6, 7, 9]. It was Centennial that emerged as the ultimate buyer, executing the agreement to merge on June 17, 2015. *Id.* ¶ 14. According to a story in the Journal the following day, "[t]he $101.6 million purchase price . . . is the second-highest price paid for a bank in Florida since 2007, and the highest price paid for a bank that's under $1 billion in assets." [Doc. 450-7 at p. 25]. The Journal further reported that "[a]ll of Bay Cities top executives plan to stay with Centennial, including Bryant, who will

17

oversee banking activities in greater Tampa Bay." *Id.* at p. 26. In his "exclusive interview" with the Journal for the story, Mr. Bryant remarked that Centennial was "paying a big price for [Bay Cities]" and that "[y]ou just don't pay a big premium for someone and then fundamentally change what they do and what they're about and the people." *Id.* In fact, the Journal specifically reported in subsequent stories that "all of the bank's top executives plan to stay with Centennial, and customer-facing employees won't be affected by the deal, although some back-office workers may be impacted." *Id.* at pp. 28, 30.

On December 31, 2015, Mr. Bryant emailed his letter of resignation to Centennial's president and he also attached the resignations of Mr. Murrin, Ms. Davey, and Mr. Zunz. [Doc. 501 ¶ 21]. The news was reported a few days later in the Journal, which described Mr. Bryant as "a key player in negotiating Bay Cities' $104 million sale to Centennial." [Doc. 450 at p. 53]. The following week, the Journal reported that Mr. Bryant had "joined ServisFirst Bank as CEO for Tampa Bay" and that Centennial had filed a lawsuit related to this. *Id.* a pp. 57, 59. The evidence before the Court shows continued coverage by the Journal regarding the developments following the merger between the two banks and a focus on Mr. Bryant's role, as the "key player," in these events. He has provided no evidence to the contrary.

Moreover, the statements made by Mr. Allison were certainly germane to Mr. Bryant's involvement in the controversy, thus satisfying the second part of the test as to whether one qualifies as a public person for a limited purpose. The first statement, that Mr. Allison would have eventually fired Mr. Bryant because Tampa Bay was

18

Centennial's worst performing region, goes directly to Mr. Bryant's departure from Centennial. It is the departure from Centennial that has given rise to this lawsuit and by his statement, Mr. Allison certainly offered comment related to Mr. Bryant's continued occupation with the bank had he not left for ServisFirst. Likewise, the statements during the earnings call that "[t]he good news is the CEO[, Mr. Bryant,] and the CLO are no longer with us" because Centennial had to go in and "clean that mess up" and there was about $23 million worth of non- performing and about 5% past due loans, also relate directly to Mr. Bryant's exit from the bank as regional president and the reason Mr. Allison believes this was "good news."

As Mr. Allison contends, Mr. Bryant's role and conduct has invited attention, comment, and criticism. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974); *Silvester*, 839 F.2d at 1494. Based on his involvement in the merger of the banks and his role in providing comments to the Journal on this and other issues in banking in the Tampa Bay area, the Court finds that Mr. Bryant is clearly a public figure for a limited purpose, his participation in the banking industry. As such, for liability to exist there must be a showing that Mr. Allison acted with malice.[7] *Silvester*, 839 F.2d at 1493.

    ii.   <u>No proof of actual malice</u>

---

[7] While the Court need not address whether Mr. Bryant also qualifies as a public figure for all purposes, the evidence presented does not reflect that Mr. Bryant has the "persuasive power and influence" that is characteristic of one who is a public figure for all purposes. *Hutchinson*, 443 U.S. at 134. Additionally, the Court need not consider whether common law protections or those provided by the Florida Statutes apply.

Because Mr. Bryant is a public figure, proof of actual malice—by *clear and convincing evidence*—is required.   *Berisha*, 973 F.3d at 1310, 1312. To show actual malice, a plaintiff must show that the "defendant[] published the defamatory material with a 'high degree of awareness of … [its] probable falsity.' " *Id.* at 1312 (quoting *Garrison*, 379 U.S. at 74). "It is a subjective test, which asks whether the publisher '*in fact* entertained serious doubts as to the truth of his publication.' " *Id.* (quoting *Silvester*, 839 F.2d at 1498). Mr. Allison argues that even if Mr. Bryant could offer evidence as to the falsity of the statements, the Court could not also conclude that a reasonable jury could find with convincing clarity that when he made his statements to Broughton and to the investors, he knew that his statements about Mr. Bryant were false or that he recklessly disregarded the truth. [Doc. 450 at pp. 36-37]. Mr. Allison explains that when he made the statements Centennial had only just begun to uncover facts relating to self-dealing that Mr. Bryant had engaged in and actively concealed. *Id.* at pp. 12-14, 19-20, 33-37.  Mr. Allison also argues—in the section on negligence—that he relied on information available from his reliable team of bank officers when he made the statement to Mr. Broughton and when he spoke during the earnings conference call. *Id.* at pp. 37-38.

Mr. Bryant contends that Mr. Allison displayed extreme personal animosity and express malice towards him. [Doc. 492 at pp. 4-6, 15]. In fact, he claims that Mr. Allision concluded that he deserved to pay. *Id.* at p. 15. Allegedly, Mr. Allison was upset because: (i) Centennial paid more for Bay Cities than Allison wanted to pay; (ii)

Hovde[8] negotiated stock for Bryant (which Bryant abandoned before it vested); and (iii) after the merger closed, Bryant decided he did not want to work for Centennial "forever." *Id.* at p. 6. Mr. Bryant also notes that Mr. Allision's statements conflicted with the claims in the verified complaint, which depicted him as a talented banker whose departure crippled Centennial and destroyed the purpose of the acquisition. *Id.* at pp. 6-7.

The evidence before the Court does not reflect an issue of fact as to whether Mr. Allision made the statements at issue with a "high degree of awareness of … [their] probable falsity." *Berisha*, 973 F.3d at 1310 (internal quotes omitted). As Mr. Allision notes, in his reply, "Bryant does not contest that Tampa was Centennial's worst performing bank under Bryant or that Allison would have fired him." [Doc. 511 at p. 16]. This is telling. Moreover, and importantly, it is unrefuted that regardless of whatever animosity Mr. Allison harbored towards Mr. Bryant, he relied on information from his team of bank officers when the statements were made.[9] *Id.* at pp. 37-38. That Mr. Bryant was described in a verified complaint as "a mature and experienced community banker" whose "departure inhibits growth" is by no means indicative of whether there were nonperforming loans at the bank, whether they had also then discovered information as to his self-dealing, and even whether they would have still kept him on. Bryant fails to establish actual malice. Accordingly, no genuine

---

[8] Hovde Group, LLC  had been hired to market Bay Cities for sale. [Doc. 492 at p. 4 n.3].
[9] Mr. Allision's behavior towards Mr. Bryant during the deposition is not sufficient to establish actual malice at the time the alleged defamatory statements were made, about three years earlier.

issues of material fact exist as to whether Mr. Allison acted with actual malice when making the statements about Mr. Bryant, a limited public figure.

## IV.   CONCLUSION

In sum, Mr. Allision's statements are not actionable as they constitute pure opinion. In making the statements at issue, Mr. Allison presented an opinion along with facts supporting that opinion. Therefore, as a matter of law, Mr. Bryant cannot show the falsity of the statements. Mr. Bryant also has not created an issue of fact as to the existence of malice, which he must do as a limited public figure, a designation warranted by his key role in the acquisition of Bay Cities by Centennial and the series of events that unfolded afterwards, as reported in the media.  Because no genuine issues of material fact exist, Third-Party/Counter-Defendant John W. Allison is entitled to judgment in his favor.

Accordingly, it is hereby **ORDERED**:

1.  Third-Party/Counter-Defendant John W. Allison's Dispositive Motion for Final Summary Judgment [Doc. 450], in which Plaintiff/ Counter-Defendant Centennial Bank joined [Doc. 451], is **GRANTED**.

2.  A judgment in favor of Third-Party/Counter-Defendant John W. Allison and Plaintiff/Counter-Defendant Centennial Bank, and against Defendant/Third-Party Plaintiff, Gregory W. Bryant, as to the Third-Party Counterclaim will be entered at the conclusion of this litigation.

**DONE AND ORDERED** at Tampa, Florida on March 10, 2020.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of record and unrepresented parties, if any

23